ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23-1035 (Consolidated with Nos. 23-1036, 23-1037, 23-1038)

---

ELECTRIC ENERGY, INC., *et al.*,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

Respondents.

---

Petitions for Review of Actions of the
United States Environmental Protection Agency

---

**BRIEF OF RESPONDENT ENVIRONMENTAL PROTECTION AGENCY**

---

OF COUNSEL:

LAUREL CELESTE
U.S. Environmental Protection Agency
Office of General Counsel
William Jefferson Clinton Building
1200 Pennsylvania Ave., NW
Mail Code 2344A
Washington, D.C. 20460
Tel: (202) 564-1751

DATE: Nov. 17, 2023

TODD KIM
Assistant Attorney General
Environment & Natural Resources Div.

PERRY M. ROSEN
DAVID MITCHELL
United States Department of Justice
Environment & Natural Resources Div.
Environmental Defense Section
P.O. Box 7611
Washington D.C. 20044
Tel: (202) 353-7792

Counsel for Respondents

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Respondents Environmental Protection Agency and Administrator Michael Regan (collectively "EPA") acknowledge that Petitioners' Brief sets out the parties and the actions they challenge. EPA does not agree with Petitioners' statement that EPA promulgated regulations or requirements, either on January 11, 2022 or in the order challenged in this case, the Gavin Order, other than as specified herein.

## CORPORATE DISCLOSURE STATEMENT

Respondent EPA is a governmental entity for which a corporate disclosure statement is not required.

So certified this 17th day of November, 2023, by


/s/ *Perry M. Rosen*
Perry M. Rosen
Counsel for Respondents

ii

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ....................................................3

STATUTES AND REGULATIONS.....................................................4

STATEMENT OF ISSUES..................................................................4

STATEMENT OF THE CASE ............................................................5

      A.    Statutory Background ........................................................5

      B.    Regulatory Background .....................................................6

            1.    The 2015 Rule ..........................................................6

            2.    The Court's Review of the 2015 Rule in USWAG v. EPA........8

            3.    The 2020 Rule ..........................................................9

      C.    Gavin's Extension Request .............................................11

      D.    The Gavin Order ............................................................11

            1.    EPA Found that Gavin Failed to Meet the Waste-in-Place Closure Standards of Section 257.102(d) ...............12

            2.    EPA Independently Found That Gavin Failed to Satisfy the 2015 Rule's Monitoring and Sampling Criteria ................14

            3.    EPA Imposed New Closure Requirements on Gavin...............15

STANDARD OF REVIEW ...............................................................15

SUMMARY OF ARGUMENT .........................................................16

ARGUMENT.....................................................................................19

I.    THIS COURT HAS JURISDICTION TO REVIEW THE GAVIN ORDER ...................................................................................19

      A.    The Gavin Order, Which Promulgated a New "Requirement," is Reviewable Directly in This Court ...............................19

B.     The Entire Gavin Order Is Under Review, And Petitioners Have Forfeited All Challenges to the Order That Are Not Presented..........24

II.     THE GAVIN ORDER IS NOT A LEGISLATIVE RULE ..........................27

A.     The Gavin Order Is Not a Legislative Rule .......................................28

1.     The Gavin Order Is an Order, Not a Rule................................28

2.     If the Gavin Order Is a Rule, It Is Not a Legislative Rule .....................................................................................31

3.     The Gavin Order is Not a "Rule" Even Under the Precedent Relied Upon by Petitioners .....................................38

a.     The 2015 Rule, Not the Gavin Order, Provides the Basis for Application of the Waste-in-Place Closure Standards .........................................................39

b.     EPA Did Not Invoke its Legislative Authority to Create New Standards in the Gavin Order....................41

c.     The Gavin Order Does Not Amend the Regulatory Text ...........................................................................44

B.     The Gavin Order Should Be Upheld Even If It Is a Legislative Rule, as There is no Prejudicial Error................................................46

III.     THE 2015 RULE AND EPA GUIDANCE PROVIDED FAIR NOTICE OF THE WASTE-IN-PLACE CLOSURE STANDARDS................................47

IV.     EPA HAD TO INDEPENDENTLY DETERMINE WHETHER GAVIN DEMONSTRATED COMPLIANCE WITH ALL REGULATIONS..........52

CONCLUSION ....................................................................................................55

iv

# <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Am. Portland Cement All. v. EPA,*
101 F.3d 772 (D.C. Cir. 1996) ........................................... 22, 24, 25

*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000) ................................................ 31

*Artis v. District of Columbia,*
583 U.S. 71 (2018) ................................................................. 20

*Cent. Tex. Tel. Coop., Inc.,*
402 F.3d 205 (D.C. Cir. 2005) ................................................ 29

*City of Rochester v. Bond,*
603 F.2d 927 (D.C. Cir. 1979) ................................................ 25

*Conference Group LLC v. FCC,*
720 F.3d 957 (D.C. Cir. 2013) ................................................ 42

*Conference Group,*
720 F.3d ................................................................................ 43

*DHS v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ........................................................... 48

*FTC v. Tarriff,*
584 F.3d 1088 (D.C. Cir. 2009) .............................................. 22

*GMS Mine Repair v. Fed. Mine Safety & Health Review Comm'n,*
72 F.4th 1314 (D.C. Cir. 2023) ............................................... 15

*Hazardous Waste Treatment Council v. EPA*
910 F.2d 974 (D.C. Cir. 1990) ................................................ 26

*Howmet Corp. v. EPA,*
614 F.3d 544 (D.C. Cir. 2010) ................................................ 48

*Int'l Internship Program v. Napolitano,*
718 F.3d 986 (D.C. Cir. 2013) ................................................ 29

*ITServe All., Inc. v. United States Dep't of Homeland Sec.,*
71 F.4th 1028 (D.C. Cir. 2023) ........................................... 40, 41

v

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ...........................................................15, 36, 38

*Kreis v. Sec'y of the Air Force*,
   406 F.3d 684 (D.C. Cir. 2005) ....................................................... 40

*N.Y. Republican State Comm. v. SEC*,
   799 F.3d 1126 (D.C. Cir. 2015) ..................................................... 24

*Nat'l Biodiesel Bd. v. EPA*,
   843 F.3d 1010 (D.C. Cir. 2016) ......................................... 28-29, 46

*Neustar, Inc. v. FCC*,
   857 F.3d 886 (D.C. Cir. 2017) ....................................................... 30

*NLRB v. Bell Aerospace Co. Div. of Textron Inc.*,
   416 U.S. 267 (1974) ....................................................................... 30

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
   995 F.2d 1106 (D.C. Cir. 1993) .............................................. 17, 38

*Perez v. Mortgage Bankers Ass'n*,
   572 U.S. 92 (2015) ......................................................................... 34

*POM Wonderful, LLC v. FTC*,
   777 F.3d 478 (D.C. Cir. 2015) ....................................................... 30

*Shell Oil Co. v. FERC*,
   47 F.3d 1186 (D.C. Cir. 1995) ....................................................... 25

*Telecomms. Rsch. & Action Ctr. v. FCC*
   (TRAC), 750 F.2d 70 (D.C. Cir. 1984) ......................................... 19

*Utah Power & Light Co. v. EPA*,
   553 F.2d 215 (D.C. Cir. 1977) ................................................. 26, 27

*\*Utility Solid Waste Activities Grp. v. EPA*
   901 F.3d 414 (D.C. Cir. 2018) ................................. 2, 8, 9, 36, 37, 42

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*
   82 F.4th 1273 (D.C. Cir. 2023) ..................................................... 46

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
   516 U.S. 199 (1996) ....................................................................... 25

**Statutes**

5 U.S.C. § 551(6) ......................................................................... 23, 29

5 U.S.C. § 553(b)(A) ............................................................................ 34

5 U.S.C. § 706 ............................................................................... 15, 46

28 U.S.C. § 1292(b) .............................................................................. 25

42 U.S.C. § 6901(b)(4) ........................................................................... 5

42 U.S.C. § 6903(14), ............................................................................ 5

42 U.S.C. § 6903(3) ............................................................................... 5

42 U.S.C. § 6907(a)(2) ........................................................................... 5

42 U.S.C. § 6925 ................................................................................. 23

42 U.S.C. § 6926 ................................................................................. 23

42 U.S.C. § 6944 .................................................................................. 5

42 U.S.C. § 6944(a) ........................................................... 5, 35, 42, 47

42 U.S.C. § 6945 .................................................................................. 5

42 U.S.C. § 6945(a) ............................................................................. 22

42 U.S.C. § 6945(d)(1) .......................................................................... 6

42 U.S.C. § 6945(d)(4) ..................................................................... 6, 55

42 U.S.C. § 6972(a)(1)(A) .................................................................... 54

42 U.S.C. § 6976(a) ....................................................................... 15, 23

42 U.S.C. § 6976(a)(1) .............................. 2, 3, 4, 15, 16, 19, 20, 21, 23, 24, 25, 26

42 U.S.C. § 6976(a)(2) .......................................................................... 23

42 U.S.C. § 6976(b) ............................................................................. 23

42 U.S.C. § 6976(b) ............................................................................. 23

42 U.S.C. § 7607(b)(1) ......................................................................... 27

**Rules**

Fed. R. App. P. 32(a)(5) ....................................................................... 57

Fed. R. App. P. 32(a)(6) ....................................................................... 57

Fed. R. App. P. 37(a)(7)(b) .................................................................... 57

Fed. R. App. P. 32(a)(7)(B) .................................................................... 57

Fed. R. App. P. 32(a)(7)(B)(iii) ............................................................. 57

**Regulations**

40 C.F.R. Part 257, Subpart D .................................................................... 6

40 C.F.R. § 257.53 ..................................................................................32

40 C.F.R. §§ 257.60-64 ............................................................................ 7

40 C.F.R. § 257.60(a) ............................................................................... 9

40 C.F.R. §§ 257.71-72 ............................................................................ 7

40 C.F.R. §§ 257.73-74 ............................................................................ 7

40 C.F.R. § 257.82 ................................................................................... 7

40 C.F.R. §§ 257.90-95 ................................................................7, 12, 19, 52

40 C.F.R. § 257.91(f) ..............................................................................54

40 C.F.R. §§ 257.96-98 ............................................................................ 7

40 C.F.R. §§ 257.100-103 ......................................................................... 7

40 C.F.R. § 257.101(a)(1) ........................................................................20

40 C.F.R. § 257.102(b) ............................................................................11

*40 C.F.R. § 257.102(d) ...............................3, 11, 19, 27, 35, 47, 48, 52

40 C.F.R. § 257.102(d)(1) .................................................................13, 32

40 C.F.R. § 257.102(d)(1)(i) .........................................................1, 7, 33, 47

40 C.F.R. § 257.102(d)(1)(ii) ..............................................................7, 36

40 C.F.R. §§ 257.102(d)(1)(iii) ................................................................ 7

40 C.F.R. § 257.102(d)(2)..................................................................13, 35

40 C.F.R. § 257.102(d)(2)(i) ............................................................7, 35

40 C.F.R. § 257.102(d)(3) .................................................................... 7

40 C.F.R. § 257.102(d)(3)(iii) ...............................................................54

40 C.F.R. § 257.103(f)(1) ...............................................................20, 52

40 C.F.R. § 257.103(f)(1)(iii)..........................................................10, 53

40 C.F.R. § 257.103(f)(1)(iv) ................................................................10

40 C.F.R. § 257.103(f)(1)(iv)(B) ...........................................................53

40 C.F.R. § 257.103(f)(1)(viii).......................................................10, 53

40 C.F.R. § 257.103(f)(3) .......................................................................53

40 C.F.R. § 257.103(f)(3)(ii)........................................ 10, 20, 21, 22, 31

40 C.F.R. § 257.103(f)(3)(iv) ................................................................10

40 C.F.R. §257.104(c)...........................................................................37

## Federal Registers

50 Fed. Reg. 11,068 (Mar. 19, 1985) ..................................................50

75 Fed. Reg. 35,193 (June 21, 2010)..................................................6, 51

80 Fed. Reg. 21,302 (Apr. 17, 2015)............................................6, 51, 54

83 Fed. Reg. 36,435 (July 30, 2018) ..................................................... 9

85 Fed. Reg. 12,456 (Mar. 3, 2020) .....................................................51

85 Fed. Reg. 53,516 (Aug. 28, 2020) ........................................ 9, 10, 21, 28, 29, 53

87 Fed. Reg. 72,989 (Nov. 28, 2022) ...........................................................11, 12

88 Fed. Reg. 31,982 (May 18, 2023).........................................................34, 44, 45

88 Fed. Reg. 55,220 (Aug. 14, 2023)…………………………..……………40

**Other Authorities**

Oxford Latin Dictionary 1947 (1982) .................................................................21

Pub. L. 94-580 § 7006 (Oct. 21, 1976).................................................................23

Pub. L. 96-482 § 27(b) (Oct. 21, 1980) ...............................................................23

Webster's New International Dictionary 2662 (2d ed. 1957) ...............................21

## **GLOSSARY**

**APA**              Administrative Procedure Act

**CCR**              Coal Combustion Residuals

**Doc.**             Document

**EPA**              Environmental Protection Agency

**JA**               Joint Appendix

**RCRA**             Resource Conservation and Recovery Act

**RTC**              Response to Comments

**WIIN Act**         Water Infrastructure Improvements for the Nation Act

## INTRODUCTION

Coal combustion residuals ("CCR") are highly toxic wastes from coal-fired power plants. Petitioner Gavin Power, LLC operates a large, coal-fired power plant in Ohio. For decades, Gavin disposed of millions of tons of CCR in large, unlined surface impoundments, including one comprising more than 300 acres several dozen feet deep. Gavin built this impoundment in the adjacent river valley by damming existing streams, which altered the groundwater table so that water flows through the bottom of the impoundment. Groundwater continuously flows in and out of the impoundment, releasing leachate and potentially dispersing CCR contaminants that include arsenic and myriad other carcinogens and neurotoxins.

In 2015, EPA promulgated regulations under the Resource Conservation and Recovery Act ("RCRA") that set standards for closing CCR impoundments. Those regulations prohibit closing an impoundment by permanently leaving CCR in place unless the owner has "[c]ontrol[led], minimize[d] or eliminate[d], to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters." 40 C.F.R. § 257.102(d)(i). The regulations also require an operator to prevent the impoundment of water in a closed unit and to eliminate all free liquids from the impoundment. *Id*. Otherwise, the closure would violate the statutory standard "that any solid waste disposal site pose 'no reasonable probability of adverse effects on

1

health or the environment.'" *Utility Solid Waste Activities Grp. v. EPA* ("*USWAG*"), 901 F.3d 414, 427 (D.C. Cir. 2018) (quoting 42 U.S.C. § 6944(a)).

In 2020, EPA prescribed a default deadline of April 11, 2021, for unlined CCR impoundments to initiate closure. But EPA permitted any owner to apply for a deadline extension upon a demonstration that its entire facility complied with the 2015 regulations. Gavin applied to EPA for an extension of its deadline until May 2023 which, after review and public comment, EPA denied.

Petitioners challenge EPA's 2022 denial of Gavin's extension request (the "Gavin Order"), in which EPA set a new deadline of April 12, 2023, thereby establishing a closure "requirement," as that term is used in RCRA, specific to Gavin's facility. *See* 42 U.S.C. § 6976(a)(1) (providing for direct review in this Court of every RCRA "regulation[] or requirement"). EPA explained that Gavin did not qualify for an extension because, among other things, it took no measures to address groundwater inundating its unlined impoundment. EPA found that— owing to Gavin's failure to take the measures required by the 2015 rule—CCR in this impoundment remains saturated by groundwater, and the impoundment continually releases leachate and/or CCR to the groundwater. Petitioners do not challenge the substance of EPA's findings and hence have waived any argument contesting these findings on their merits.

2

To the extent the Court reaches Petitioners' arguments, those arguments should be rejected. In the Gavin Order, EPA made the site-specific, fact-bound conclusion that by leaving a CCR impoundment inundated with groundwater and failing to prevent continual leaching of groundwater and/or CCR from the unit, Gavin has not satisfied the plain terms of 40 C.F.R. § 257.102(d). In explaining that Gavin failed to address "free liquids" or "infiltration of liquids" (two phrases from the 2015 Rule) in its impoundment, EPA reasoned that groundwater is a textbook "liquid." Petitioners contend that, in making these findings, EPA in effect issued a new legislative rule—one Petitioners call "the waste below the water table" rule. But EPA cannot be said to issue a new rule, much less a *legislative* rule, every time it applies the plain meaning of an existing rule in an adjudication. Further, Petitioners had fair notice of EPA's interpretation long before it was applied here. Gavin's last argument, that EPA lacked authority to review the findings of the company's engineer for accuracy, fails also. Congress authorized EPA to enforce its CCR regulations, and that power would be toothless if a regulated party could bind EPA merely by proffering evidence of purported compliance.

## STATEMENT OF JURISDICTION

The Court has jurisdiction to directly review EPA action that "promulgat[es] any regulation, or requirement" under RCRA. 42 U.S.C. § 6976(a)(1). For reasons

explained in Part I, *infra*, in the agency decision under review, EPA promulgated a new "requirement" (i.e., a closure-initiation mandate) with legal consequences for the Gavin facility. This Court accordingly has jurisdiction to review EPA's action.

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in the addenda to the parties' briefs.

## STATEMENT OF ISSUES

1.    Does this Court have jurisdiction to directly review the Gavin Order, which promulgated a legally enforceable "requirement," 42 U.S.C. § 6976(a)(1), that Gavin initiate closure of its CCR impoundment by a date certain?

2.    Is the Gavin Order, which applied existing regulations to a single facility, and which was issued through adjudication and in response to a request submitted by Gavin with respect to that facility, a legislative rule?

3.    Were Petitioners denied fair notice of an EPA interpretation of text in existing regulations, where the interpretation follows from the plain meaning of the rule's text, EPA has long applied similar regulations in the same manner, and EPA solicited comment when it proposed to deny Gavin's extension request?

4.    Must EPA defer to the opinion of a facility owner's engineer that the facility complies with EPA's regulations, where governing law charges EPA with independently assessing whether the owner has demonstrated compliance with all regulations?

4

## STATEMENT OF THE CASE

### A.    Statutory Background

RCRA directs EPA to promulgate regulations defining what a waste facility must do to qualify as a "sanitary landfill," rather than an "open dump." 42 U.S.C. § 6944(a). A waste unit cannot be a sanitary landfill unless "there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste," either during facility operation or post-closure. *Id.* Open dumps must either retrofit or close using procedures prescribed by EPA. *Id.* §§ 6903(14), 6944, 6945.

EPA must issue regulations to protect against contamination of groundwater from disposal of solid waste. Groundwater contamination is "particularly harmful to health [as it] contaminates drinking water from underground and surface supplies." 42 U.S.C. § 6901(b)(4). *See also id.* § 6907(a)(2) (requiring that EPA provide for "protection of the quality of ground waters and surface waters from leachates"); *id.* § 6903(3) (defining "disposal" to include "leaking[] or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may … [be] discharged into any waters, including ground waters").

At one time, EPA's CCR regulations were enforceable only by States or citizens. But the Water Infrastructure Improvements for the Nation Act of 2016 ("WIIN Act"), Pub. L. No. 114-322, 130 Stat. 1628, authorized EPA to enforce

5

violations of its CCR regulations, as well as violations of State and Federal RCRA

CCR permits. 42 U.S.C. § 6945(d)(4). EPA may approve a State CCR permit

program to operate in lieu of federal regulations, but only if the State's criteria are

"at least as protective as the criteria" established by EPA. *Id.* § 6945(d)(1).

### B.    Regulatory Background

#### 1.    The 2015 Rule

CCR comprises various waste products from combustion of coal, including

"fly ash," "bottom ash," "boiler slag," and "flue gas desulfurization materials." *See*

75 Fed. Reg. 35,193, 35,137 (June 21, 2010). It contains carcinogens and

neurotoxins, including arsenic, boron, cadmium, hexavalent chromium, lead,

lithium, mercury, molybdenum, selenium, and thallium. 80 Fed. Reg. 21,302,

21,449 (Apr. 17, 2015). Risks to humans associated with exposure to these

contaminants include elevated risk of "cancer in the skin, liver, bladder, and

lungs," "neurological and psychiatric effects," "cardiovascular effects," "damage

to blood vessels," and "anemia." *Id*. at 21,451. Infants and children face higher

risks than adults. *Id*. at 21,466.

In 2015, EPA promulgated comprehensive criteria governing disposal and

management of CCR. 80 Fed. Reg. 21,302 ("2015 Rule") (codified at 40 C.F.R.

Part 257, Subpart D). EPA analyzed instances where CCR releases contaminated

ground and surface waters and found a significant probability of contamination. *Id*.

at 21,325; EPA Br. 7, Case No. 22-1056 (*Electric Energy I*), ECF 2019739. EPA

prescribed multiple standards for CCR impoundments. Among other things, the

2015 rule included restrictions relating to location (40 C.F.R. §§ 257.60-64),

structural integrity (40 C.F.R. §§ 257.73-74), liner design (40 C.F.R. §§ 257.71-

72), flood control (40 C.F.R. § 257.82), groundwater monitoring (40 C.F.R.

§§ 257.90-95), corrective action or remediation (40 CFR §§ 257.96–98), and

closure (40 C.F.R. §§ 257.100-103). All those restrictions help ensure that

groundwater and surface water, among other things, are not contaminated by CCR.

Relevant here, the 2015 rule governs the closure of an impoundment without

removing the CCR, i.e., with "waste-in-place." Section 257.102(d), titled "Closure

performance standard when leaving CCR in place," defines performance standards

that an owner/operator must meet to close an impoundment with waste-in-place

("Waste-in-Place Closure Standards"). The owner/operator must do the following:

> (a) "control, minimize or eliminate, to the maximum extent feasible, [1] post-closure infiltration of liquids into the waste and [2] releases of CCR, leachate, or contaminated run-off to the ground or surface waters";

> (b) "[p]reclude the probability of future impoundment of water"; and

> (c) "*prior* to installing the final cover system," ensure that "[f]ree liquids … be eliminated."

40 C.F.R. §§ 257.102(d)(1)(i), (ii), (2)(i) (emphasis added). Separate standards

apply to the cover for a closed impoundment.  *See id*. § 257.102(d)(1)(iii), (3).

## 2.    This Court's Review of the 2015 Rule in *USWAG v. EPA*

Several parties challenged the 2015 Rule in this Court. The Court rejected most challenges but vacated provisions of the rule that had allowed (1) unlined impoundments to remain open until a leak was discovered, and (2) clay-lined impoundments to continue operating indefinitely. The Court found that EPA's failure to require closure of such units violated RCRA's mandate to "develop standards that limit permissible waste sites '[a]t a minimum' to those with 'no reasonable probability of adverse effects on health or the environment from disposal of solid waste.'" *USWAG*, 901 F.3d at 442 (quoting 42 U.S.C. § 6944(a)); *see also id.* at 430, 432, 439.

The Court based its conclusions, in part, on record information that leaking units can lead to "contaminants [moving] into the underlying soil and groundwater, threatening sources of drinking water … through harmful constituents that migrate through groundwater." *Id.* at 422. *See also id.* at 421-22, 428-30 (referring to the record establishing that exposures from contaminated drinking water resulted in unacceptable cancer risk from arsenic and unacceptable non-cancer risks from lithium, molybdenum, and thallium). The Court faulted EPA for failing to account for the harm from "continued leakage" from unlined impoundments. *Id.* at 429 ("The Rule addresses neither the risks to public health and to the environment

8

before leakage is detected, nor the harms from continued leakage during the years before leakage is ultimately halted by retrofit or closure.").

Petitioners did not challenge the Waste-in-Place Closure Standards in Section 257.102(d) when promulgated and have thus forfeited any claim that they are overbroad or unclear. *See* EPA Br. 50-51, *Electric Energy I.* They did challenge a location restriction in 40 C.F.R. § 257.60(a) that "requires that all surface impoundments be located no fewer than five feet above the uppermost aquifer." *USAWG*, 901 F.3d at 442-43. The Court rejected Petitioners' challenge, finding that such a restriction "faithfully tracks the [groundwater-protection] goals set forth in the preamble" to the rule. *Id*. at 443.

### 3.    The 2020 Rule

In July 2018, EPA extended the deadline by which a leaking unlined surface impoundment would need to initiate closure until October 31, 2020.  83 Fed. Reg. 36,435, 36,454-55. One month later, this Court vacated the provision EPA had just modified. *USWAG*, 901 F.3d at 442. On March 19, 2019 this Court remanded back the July 2018 rule to allow EPA to promulgate a new rule setting a deadline to initiate closure consistent with the USWAG decision. *Waterkeeper Alliance, Inc. v. EPA*, No. 18-1289, Doc. 1777351 (D.C. Cir  March 13, 2019).

A little over a year later, EPA promulgated a regulation that was titled in part "Deadline to Initiate Closure Rule." 85 Fed. Reg. 53,516 (Aug. 28, 2020)

9

("2020 Rule"). That regulation set a default April 11, 2021, deadline for unlined surface impoundments to cease receiving waste and initiate closure ("Closure Initiation Date"). *Id.* By rule, however, a regulated entity could apply to EPA for an extension of that deadline up to and including October 15, 2024, if the entity could show, among other things, both that: (a) there was no reasonable alternative unit in which to dispose of CCR; and (b) the entire facility—not just the impoundment for which an extension was sought—complied with all the applicable regulations, including those that govern closure and separate monitoring/sampling standards. *Id.* at 53,540/3-53,546; 40 C.F.R. § 257.103(f)(1)(iii), (iv), (viii); JA___ (Gavin Order at 7, 12-13).

If an extension applicant submits a "complete" demonstration of compliance with the regulatory criteria for an extension, EPA must publish a proposed decision and consider public comments. 40 C.F.R. § 257.103(f)(3)(ii). Until EPA reaches a final decision on the application, the facility's closure deadline is tolled. 85 Fed. Reg. at 53,550/2-53,552; 40 C.F.R. § 257.103(f)(3)(ii). EPA's final decision must "specify the facility's deadline to cease receipt of waste" and initiate closure, regardless of whether the extension request is granted. 85 Fed. Reg. at 53,552/3; 40 C.F.R. § 257.103(f)(3)(ii), (iv).

10

### C.    Gavin's Extension Request

In 2020, EPA received 57 requests for extensions. These submissions presented EPA with the first opportunity to evaluate the adequacy of closure plans, with detailed information about individual site conditions, at multiple facilities. One of those extension requests was from Gavin, which applied to EPA for an extension of its closure deadline until May 4, 2023, to initiate closure of its Bottom Ash Pond impoundment ("BAP"). JA___ (EPA-HQ-OLEM-2021-0590-0003, Gavin "Demonstration," cover page picturing Bottom Ash Pond at Ex. A hereto). Gavin did not seek an extension for its Fly Ash Reservoir ("FAR") impoundment at the same facility, which Gavin claims was closed in July 2021. Pet. Br. at 17-18.

In January 2022, EPA proposed to deny Gavin's extension request. JA___ (EPA-HQ-OLEM-2021-0590-0002). EPA received 30 public comments, including from Petitioners. JA___ (Gavin Order at 12); Pet. Br. at 18. EPA responded to those comments in the Gavin Order or in a separate document responding to comments. JA___ (EPA-HQ-OLEM-2021-0590-0099, "RTC"); JA___ (Gavin Order at 12).

### D.    The Gavin Order

On November 18, 2022, EPA issued its final, 94-page Gavin Order and published notice of the decision in the Federal Register. 87 Fed. Reg. 72,989 (Nov. 28, 2022). EPA rejected Gavin's extension request on multiple grounds, finding

11

that Gavin had not demonstrated that it was in compliance with: (1) independent aspects of the Waste-in-Place Closure Standards of 40 C.F.R. § 257.102(d); (2) the closure-plan criteria set forth in 40 C.F.R. § 257.102(b); and (3) separate monitoring/sampling criteria set forth in 40 C.F.R. § 257.91-94. 87 Fed. Reg. at 72,990; JA___ (Gavin Order at 12-45; 45-76).

### 1.    EPA Found that Gavin Failed to Meet the Waste-in-Place Closure Standards of Section 257.102(d)

EPA explained that Gavin (and commenters) failed to demonstrate that the entire Gavin facility—that is, all surface impoundments and landfills—complied with all regulatory standards. JA___ (Gavin Order at 13.) EPA described in detail the facility's hydrogeology. The Fly Ash Reservoir was an unlined impoundment created by constructing an earth fill-dam across a valley and an existing network of streams. The 314-acre impoundment rose approximately 145 feet above the valley floor and is nearly 2,000 feet wide. JA___ (Gavin Order at 16-17.)

EPA determined that Gavin had not refuted that: (a) parts of the 314-acre Fly Ash Reservoir sit in groundwater up to 64 feet deep, resulting in the saturation of up to 40% of the CCR in the unit; (b) such saturation would continue indefinitely after closure; and (c) no engineering measures were implemented or evaluated to address the continued contact of groundwater with CCR in the unit. JA___ (Gavin Order at 20-28).

12

EPA explained that Gavin failed to demonstrate how closure of the Fly Ash Reservoir under these conditions would comply with the Waste-in-Place Closure Standards in 40 C.F.R. § 257.102(d). JA___ (Gavin Order at 14-24). Gavin had not shown that it would have "[c]ontrol[led], minimize[d] or eliminate[d], to the maximum extent feasible, post-closure infiltration of liquids into the waste *and* releases of CCR, leachate, or contaminated run-off to the ground or surface waters or to the atmosphere." JA___ (*Id*. at 14-15). Nor had Gavin shown that closure would "[p]reclude the probability of future impoundment of water, sediment, or slurry," or that "[f]ree liquids [had been] eliminated." JA___ (*Id*., quoting 40 C.F.R. § 257.102(d)(1), (2)). Each of these failures was a sufficient basis to deny the extension request. JA___ (*Id*. at 24.)

EPA explained that these failures meant that Gavin's leaking and unlined impoundment did not satisfy the statutory safety standard, just like the leaking unlined impoundments the Court in *USWAG* held violated RCRA. JA___ (*Id*. at 16, 40). EPA based its findings on Gavin's own data and an analysis of the specific hydrogeology unique to the Gavin site. JA___ (*Id*. at 16-20, describing, e.g., the water sources of the impoundment, stream locations, water elevations, waste deposits, nature and location of aquifers, and hydraulic connections).

EPA explained that engineering measures could potentially address the infiltration of liquid into, and releases from, the Fly Ash Reservoir to groundwater,

the elimination of free liquids, and the future impoundment of water in the Fly Ash Reservoir. JA____ (*Id.* at 25-30). Those measures included diversion, interception, installation of wells, and collector underdrain systems, all measures that EPA had outlined in guidance published as far back as 1982. *Id.* Yet Gavin neither evaluated nor implemented any such measures. *Id.*

## 2. EPA Independently Found That Gavin Failed to Satisfy the 2015 Rule's Monitoring and Sampling Criteria

The Gavin Order also provided an alternative basis to deny the extension request: Gavin's noncompliance with separate groundwater monitoring/sampling standards. In detailed findings, EPA explained that:

(a) Gavin had failed to comply with the sampling and analysis provisions at 40 C.F.R. §§ 257.93-94, which are designed to detect downgradient contamination from the closed unit (JA____, Gavin Order at 45-54);

(b) Gavin's alternative source demonstrations fail to establish that sources other than Gavin's impoundments caused down-gradient contamination, as required under 40 C.F.R. § 257.94(e) (JA____, *id.* at 54-70); and

(c) Gavin's groundwater monitoring network, which is required to operate for 30 years post-closure, failed to comply with design standards at 40 C.F.R. § 257.91, which ensure detection of downgradient contamination (JA____, *id.* at 70-76).

14

### 3.    EPA Imposed New Closure Requirements on Gavin

The Gavin Order directs Gavin to cease receipt of CCR and initiate closure within 135 days, by April 12, 2023. JA___ (Gavin Order at 79-80). EPA stated that because the Gavin Order promulgates a new requirement under RCRA, any challenge to the Order had to be filed in the D.C. Circuit within 90 days, per 42 U.S.C. § 6976(a)(1). JA___ (Gavin Order at 5-6).

### STANDARD OF REVIEW

This Court must uphold EPA's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. *Cf.* 42 U.S.C. § 6976(a) (applying Administrative Procedure Act ("APA") standard to review of RCRA regulations). Courts evaluate the meaning of a regulation by applying "the traditional tools of construction," including the regulation's "text, structure, history, and purpose." *GMS Mine Repair v. Fed. Mine Safety & Health Review Comm'n*, 72 F.4th 1314, 1320 (D.C. Cir. 2023) (citing *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019)). Where a regulation is "genuinely ambiguous," and the agency's interpretation is reasonable, deference to the agency's interpretation is appropriate if the agency's position is "authoritative" and represents its "fair and considered judgment." *Kisor*, 139 S.Ct. at 2416-17.

## SUMMARY OF ARGUMENT

Petitioners seek leave to have EPA's interpretation of the 2015 Rule declared invalid, requesting that this Court allow them to abandon millions of tons of coal ash in groundwater as a perpetual source of contamination for drinking water supplies. For the reasons outlined below, the law does not allow for such a result.

1.      This Court has jurisdiction to directly review the Gavin Order because it promulgated a deadline to cease receipt of waste and initiate closure of the Bottom Ash Pond impoundment. This deadline, which did not stem from any statute or regulation, is a "requirement" under 42 U.S.C. § 6976(a)(1) that makes the entire Gavin Order reviewable only in this Court. Because this Court's jurisdiction is exclusive and comprehensive, Petitioners' have waived any claims or arguments not raised in their opening brief.

2.      The Gavin Order is not a legislative rule, as Petitioners claim.  Indeed, the Gavin Order is not a rule of any kind. It was the product of EPA's adjudication of Gavin's extension application for the Bottom Ash Pond. Adjudications result in orders, not rules. Every aspect of EPA's site-specific, fact-intensive processing and review of Gavin's extension request confirms that the Gavin Order resulted from an adjudication, not a rulemaking.

16

Even if aspects of the Gavin Order could be considered a rule, that rule would be interpretive, not legislative, and would not require notice and comment. EPA did not make substantive additions to the 2015 Rule in the Gavin Order. The new cease-receipt-of-waste deadline followed from the 2020 Rule's procedure to establish a new deadline. And EPA properly applied plain-meaning interpretations of existing standards at Section 257.102(d) to eliminate free liquids; preclude the probability of future water impoundment; and control, minimize or eliminate, to the maximum extent feasible, infiltration of liquid into the unit and releases therefrom.

Petitioners are wrong that EPA's straightforward interpretation of regulatory terms redefined them and thereby amended Section 257.102(d). Petitioners misplace reliance on *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106 (D.C. Cir. 1993), but even on their reading of that case, the Gavin Order does not constitute a legislative rule. Having failed to challenge the 2015 Rule's clear closure mandates in 2015, Petitioners cannot recast the Gavin Order as a legislative rule to avoid the statutory time bar.

Even if aspects of the Gavin Order were a legislative rule, the Gavin Order should be upheld because Petitioners have not shown prejudicial error from the process EPA followed. EPA provided Petitioners (and the public) notice and an opportunity to comment on its proposed decision for Gavin, precisely what

17

Petitioners claim they needed. Further, Petitioner' legislative-rule theory leaves untouched an independent and adequate basis for EPA's decision: that leaving groundwater flowing through the Fly Ash Reservoir after closure violates the regulatory mandate to adequately control, minimize or eliminate releases of CCR from the unit.

3.      Petitioners' due process claims regarding fair notice and reliance interests also fail. The clear text of Section 257.102(d) provided Petitioners fair notice that CCR impoundments cannot be closed with waste-in-place without implementing measures to address groundwater inundation. Petitioners also have no reliance interests because EPA has never taken a contrary position. In fact, the Gavin Order is entirely consistent with recent EPA explanations of Section 257.102(d) and decades of guidance related to hazardous waste surface impoundments.

4.      Finally, Petitioners err in arguing that Gavin's engineer's compliance certifications usurp EPA's own obligation to ensure compliance for an impoundment operating extension. Under the Rule, EPA must do an independent compliance assessment. EPA explained this in the preamble to the 2020 Rule, and nothing in RCRA or the CCR regulations binds EPA to an engineer's compliance certification in exercising the Agency's enforcement authority.

# ARGUMENT

## I.    THIS COURT HAS JURISDICTION TO REVIEW THE GAVIN ORDER

Unlike in the companion case, *Electric Energy I*, where petitioners challenge a collection of non-final, non-binding EPA statements that they mislabel the "2022 Rule," this Court has jurisdiction under 42 U.S.C. § 6976(a)(1) to review the Gavin Order, which imposed a new closure initiation "requirement" under RCRA.[1] That jurisdiction is both comprehensive and exclusive. *See generally Telecomms. Research & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 77 (D.C. Cir. 1984).

### A.    The Gavin Order, Which Promulgated a New "Requirement," is Reviewable Directly in This Court

EPA determined that Gavin's Fly Ash Reservoir impoundment was not in compliance with several of the Waste-in-Place Closure Standards under Section 257.102(d) or the monitoring/sampling standards under Sections § 257.91-94. JA___ (Gavin Order at 14-75). Because the whole facility must be in compliance before an extension may be granted, EPA issued the Gavin Order denying Gavin's

---

[1] Unlike the agency actions under review in *Electric Energy I*, the Gavin Order is final. This Court also has Article III jurisdiction. EPA does not contest Gavin's standing and, notwithstanding that the April 2023 closure deadline has lapsed, Petitioners' challenge is not moot. For one thing, Petitioners assert that EPA has issued a legislative rule that continues to bind them. For another, EPA's findings apply to Gavin's Fly Ash Reservoir, which has not been properly closed, as well as to all of the Gavin site's ongoing groundwater monitoring system, which must operate for thirty years. Petitioners assert (Br. 20 n.4) continuing injury from having to comply with these requirements.

19

extension request and establishing a new Closure Initiation Date for the Bottom

Ash Pond impoundment: April 12, 2023. JA__ (*Id*. at 94). The Gavin Order's final

closure mandate and the procedures to ensure reliability are "requirements" that

make the order reviewable in this Court under the plain language of Section

6976(a)(1).

The Gavin Order, not the 2020 Rule, set Gavin's closure deadline. The 2020

Rule established a default closure deadline for unlined impoundments of April 11,

2021. 40 C.F.R. § 257.101(a)(1). Notwithstanding this deadline, an impoundment

could continue to operate if "the owner or operator submit[ted] a demonstration" of

specified criteria. *Id*. § 257.103(f)(1). The 2020 Rule stated that "[s]ubmission of a

complete demonstration will toll the facility's deadline to cease receipt of waste."

*Id*. § 257.103(f)(3)(ii). Whatever the meaning of "toll" might be in other contexts,

*cf. Artis v. District of Columbia*, 583 U.S. 71 (2018) (construing "tolled" in the

context of 28 U.S.C. § 1367), this provision does not mean that the deadline is

suspended, only to be reinstated if the extension application is later denied. The

regulatory text does not allow that, as "[s]ubmission of a complete demonstration"

*itself* tolls the deadline, regardless of whether EPA later rejects it on the merits. *Cf.*

*id.* (holding that the word "toll" in the context there meant to suspend a limitations

period until a specified end-point). Instead, a facility's timely submission of a

complete demonstration *lifts* the April 2021 deadline in the 2020 Rule for good.

*See* Oxford Latin Dictionary 1947 (1982) ("tollere," the Latin origin, means to "remove" or "lift"); Webster's New International Dictionary 2662 (2d ed. 1957) (defining "toll" as "[t]o take away; to vacate; to annul"). The rule's text makes this clear.

Ultimately, EPA must issue a decision on the owner's application after an adjudication, and "[a]ll decisions … will contain the facility's deadline to cease receipt of waste" and initiate closure. 40 C.F.R. § 257.103(f)(3)(ii). If EPA denies an extension request, "the amount of time that will be granted to the facility will be determined," not by existing regulation, but "by the factual record that has been developed through this process." 85 Fed. Reg. at 53,553. In other words, absent a decision on an extension request that sets a new deadline, no regulatory closure deadline applies. The Gavin Order's deadline thus constitutes a new requirement under RCRA for this facility.[2]

This is the type of requirement that is reviewable in this Court under Section 6976(a)(1). "By its plain terms," Section 6976(a)(1) "provides for review of only

---

[2]  In addition to setting the new closure deadline of April 2023, the Gavin Order established a process for Gavin to obtain an extension beyond this date if closure of the impoundment would adversely impact grid reliability. JA__ (Gavin Order 79-85). EPA provided that a further extension would be appropriate if the grid operator provided Gavin a "formal reliability assessment" establishing that an additional extension was necessary to maintain grid reliability, and met timing and other requirements. JA__ (*Id*. at 83-84). This new procedure—which was binding on both EPA and Gavin, and which Petitioners have not challenged—is likewise a new RCRA requirement.

three types of EPA actions: the promulgation of final regulations, the promulgation of requirements, and the denial of petitions for the promulgation, amendment or repeal of RCRA regulations." *Am. Portland Cement All. v. EPA*, 101 F.3d 772, 775 (D.C. Cir. 1996). The Gavin Order is the second type because its closure mandate is a "requirement" within the meaning of Section 6976(a)(1).

Because RCRA does not define "requirement" for purposes of its judicial-review provision, the term "must be given [its] ordinary, contemporary, common meaning." *FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009). The ordinary meaning of "requirement" is "something obligatory" or "that which is required." American Heritage Dictionary of the English Language 1105 (6th ed. 1976). The Gavin Order readily satisfies this definition. It imposes a new obligation that carries legal consequence: Gavin must cease receiving waste, thereby initiating closure, by April 12, 2023 (a date not supplied by any statute or regulation). Continued operation of the impoundment after this date violates RCRA. 42 U.S.C. § 6945(a); 40 C.F.R. § 257.103(f)(3)(ii). *See* Pet. Br. at 6 (noting "sanctions for noncompliance").

Limiting "requirements" only to rules, and not orders issued in connection with adjudications, would nullify Congress' choice to give this Court jurisdiction to directly review "requirements" *in addition to* "regulations." *Cf. Am. Portland Cement*, 101 F.3d at 775 (explaining that Congress' juxtaposition of "regulation"

22

and "determination" elsewhere in RCRA meant that "the two terms were intended to have distinct meanings"). Section 6976(a)(2) confirms that Section 6976(a)(1) provides this Court jurisdiction to review adjudicative orders, not just legislative rules. Section 6976(a)(2) establishes a procedure for supplementing the judicial record in cases involving review of an "order" for which RCRA requires formal adjudication. 42 U.S.C. § 6976(a)(2); *see* 5 U.S.C. § 551(6) (defining "order" as a final disposition "in a matter other than rule making"). The Gavin Order resulted from informal rather than formal adjudication, but the salient point is that EPA can and does promulgate "requirements" via adjudication.

Further, although it ostensibly covers all suits filed under "this section," Section 6976(a)(2) must relate to "requirements" promulgated under Section 6976(a)(1), and not EPA actions reviewable in the regional courts of appeals under Section 6976(b). Section 6976(b) did not exist when Congress enacted Section 6976(a) in 1976. *See* Pub. L. 94-580 § 7006 (Oct. 21, 1976). See also Pub. L. 96-482 §27(b) (Oct. 21, 1980) (adding new subsection (b)). And RCRA does not require formal adjudication for any of the actions reviewable under Section 6976(b) (certain RCRA Subtitle C permit actions and certain state hazardous waste program authorization actions). *See* 42 U.S.C. §§ 6925, 6926, 6976(b). Thus, Section 6976(a)(2) is inoperative in relation to Section 6976(b). Section 6976(a)(2) must relate to promulgated "requirements" under Section 6976(a)(1).

23

To the extent the language of Section 6976(a)(1) is ambiguous on any of the foregoing points, jurisdiction lies in this Court, for "absent a 'firm indication' of a contrary intention, when a direct review provision's applicability to an agency action is 'ambiguous,' we presume that Congress intended to locate jurisdiction in the courts of appeals." *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1133 (D.C. Cir. 2015) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985)). There is no "firm indication" in RCRA that Congress meant for district courts to review EPA orders, like this one, that impose binding obligations on a party.[3] Every indication points in the same direction: this Court has jurisdiction.

**B.    The Entire Gavin Order Is Under Review, And Petitioners Have Forfeited All Challenges to the Order That Are Not Presented**

Petitioners agree (Br. 6) that this Court has jurisdiction over the Gavin Order. But they offer a disjointed theory of jurisdiction, arguing that the Court can resolve only some of their claims challenging the order. In particular, Petitioners assert (Br. 53) that the Court can consider their argument that EPA's application of the 2015 Rule's criteria to the Gavin facility in effect amended EPA's regulations (which would only be permissible had EPA followed legislative-rule procedures),

---

[3] In *American Portland Cement*, this Court identified "no basis on which to conclude" that an EPA "determination" constituted a Section 6976(a)(1) "requirement," 101 F.3d at 775 n.5, where "the one portion of [the determination] that [was] binding … d[id] not present an issue ripe for review," *id.* at 778. Here, by contrast, there is no dispute that the Gavin Order's closure mandate is binding.

24

but that Petitioners will contest other aspects of the order "at the appropriate time and in the appropriate court." *Id*. But Congress designated this Court to review EPA's entire "action … in promulgating … any requirement," not just specific aspects of that action or specific arguments made against it. 42 U.S.C. § 6976(a)(1). The entire "action" is subject to review, not just the requirement, in the same way that an entire "order" certified for interlocutory review under 28 U.S.C. § 1292(b) is subject to review, not just the particular question of law that occasioned certification. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).

As the Gavin Order promulgated a "requirement," 42 U.S.C. § 6976(a)(1), this Court's jurisdiction is exclusive and comprehensive with respect to that order, which is the "action" under review. In addition to the plain language of the direct-review provision, "the policy behind having a special review procedure in the first place similarly disfavors bifurcating jurisdiction over various substantive grounds" in different courts. *City of Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979). *Cf. Shell Oil Co. v. FERC*, 47 F.3d 1186, 1195 (D.C. Cir. 1995) ("[W]here an agency order arising from a common factual background and addressing a common question of law relies on two statutory bases that give rise to separate paths for judicial review, the entire order should be reviewed in a comprehensive and coherent fashion, and that review should take place in the court of appeals.").

Accordingly, the Court has exclusive jurisdiction to address all claims that aggrieved parties may have against the Gavin Order. Petitioners may not postpone them for later review by this or another court.[4]

Petitioners nonetheless assert (Br. 52-53) that this Court lacks jurisdiction to review site-specific elements of otherwise reviewable orders. Citing *Hazardous Waste Treatment Council v. EPA*, 910 F.2d 974 (D.C. Cir. 1990), Petitioners argue that only "decisions of uniform or widespread application" are reviewable in this Court under Section 6976(a)(1). But that case considered only whether EPA's approval of a "no migration" determination to exempt the applicant from RCRA's hazardous waste land-disposal ban was a regulation. *Id.* at 975-76. The Court did not opine on its authority to review EPA actions that promulgate "requirements" reviewable in this Court under Section 6976(a)(1), much less the *scope* of such review.

Petitioners also cite *Utah Power & Light Co. v. EPA*, 553 F.2d 215 (D.C. Cir. 1977), but that case is even further afield. The Court was focused entirely on whether a petition for review of EPA action under the Clean Air Act was timely

---

[4] Petitioners assert (Br. 50-51) that if this Court agrees with the arguments they *do* present, the Gavin Order should be vacated. But because the Gavin Order is based on Gavin's independent failures to meet several regulatory standards, and Petitioners do not contest Gavin's failures with respect to most of those standards, there is no basis to vacate the Gavin Order even if the Court agrees with Petitioners' merits arguments.

filed under 42 U.S.C. § 7607(b)(1). 553 F.2d at 217-18 & n.10. The jurisdictional statute under RCRA requires *all* challenges to an EPA order be brought only in this Court and within 90 days of the challenged order, and any challenges to that order not so raised are waived.

## II.    THE GAVIN ORDER IS NOT A LEGISLATIVE RULE

The Gavin Order was issued following an informal adjudication of a regulated entity's request for an extension of its deadline to comply with existing regulatory standards. The 2020 Rule required that, to obtain an extension, Gavin demonstrate compliance with all standards prescribed by the 2015 Rule, including the Waste-in-Place Closure Standards. As explained elsewhere in this brief and in EPA's brief in *Electric Energy I*, 40 C.F.R. § 257.102(d) unambiguously requires a facility to implement engineering measures to address groundwater infiltration and to ensure that an impoundment does not release contaminants following closure. In the Gavin Order, EPA straightforwardly applied Section 257.102(d) and found that Gavin did not meet the 2015 Rule's standards. Because Gavin did not implement the necessary engineering measures, CCR in the closed Fly Ash Reservoir remains saturated by up to 64 feet of groundwater, with groundwater continually flowing in and out of the impoundment.

The Gavin Order is an informal adjudication in which EPA applied existing regulations to deny Gavin's application for a deadline extension. EPA's application

27

of existing regulations to a specific situation does not amount to a legislative rule. The aspect of the Gavin Order that goes beyond existing regulations, and that gives this Court jurisdiction—namely, the order's imposition of a one-time, date-certain, facility-specific closure deadline—is not a legislative rule either. To the extent that some aspects of the Gavin Order could be conceptualized as a rule, that rule would be interpretive, not legislative. And even if the Gavin Order *were* a legislative rule, it would not render the order invalid because EPA—which published its proposed decision, solicited and considered comments on that decision from Petitioners and others, rejected commenters' arguments that track those Petitioners now raise in this Court, and included an alternative basis for decision that Petitioners do not claim constituted a legislative rule —would have reached the same decision had the Agency followed the notice-and-comment procedures for legislative rules.

### A.    The Gavin Order Is Not a Legislative Rule

The Gavin Order is not a rule at all, but an order. To the extent that aspects of the order could be considered a rule, that rule would not be legislative.

### 1.    The Gavin Order Is an Order, Not a Rule

The entity-specific EPA proceeding culminating in the Gavin Order was an adjudication, not a rulemaking. 85 Fed. Reg. at 53,552 (explaining that the Gavin Order "is not a rulemaking"). *See also Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) (Adjudications "reflect[] highly fact-specific, case-by-case"

28

proceedings); *Int'l Internship Program v. Napolitano*, 718 F.3d 986, 988 (D.C. Cir. 2013). Orders "are the end products of adjudication," *Cent. Tex. Tel. Coop., Inc.*, 402 F.3d 205, 210 (D.C. Cir. 2005), and the APA defines an order by what it is not: a rule, *see* 5 U.S.C. § 551(6), (7). EPA made it abundantly clear in the preamble to the 2020 Rule, which inaugurated extension proceedings, that EPA would decide extension applications through adjudication and not rulemaking. 85 Fed. Reg. at 53,552. By design, then, the Gavin Order is an order; it is not a rule, legislative or otherwise.

The substance of the Gavin Order confirms as much. EPA issued the order after reviewing Gavin's facility-specific application, supporting documentation, and comments received on EPA's proposed decision. JA__ (Gavin Order at 9-14). EPA made technical findings specific to the Gavin site, relating to groundwater infiltrating into the Fly Ash Reservoir, the volume of saturated CCR that would remain after closure, the absence of engineering measures to address groundwater flowing through the unit, and the operation of the Gavin's groundwater monitoring system. JA__ (Gavin Order at 16-45, 54-76). Nowhere does the Gavin Order state that it applies to other entities or facilities—by its own terms it does not.[5]

---

[5] Petitioners claim the Gavin Order "makes clear its view new requirements 'must be met at every unit'" nationwide. Pet. Br. at 38 (quoting JA_, Gavin Order at 32). But that passage from the order merely parroted the 2015 Rule by stating that Section 257.102(d)(1)-(3) must be met by every unit closing with waste in place.

Petitioners argue that EPA's site-specific order is based on general principles whose recitation transforms the Gavin Order into a legislative rule. Pet. Br. 43. But "it is well settled that an agency is not precluded from announcing new principles in an adjudicative proceeding." *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 497 (D.C. Cir. 2015) (cleaned up). "The fact that an order rendered in an adjudication may affect agency policy and have general prospective application does not make it rulemaking." *Id.*

Petitioners' reliance on *Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017) to support their argument is unavailing. The Court in *Neustar* noted that even "[s]tatutory interpretation can be rendered in the form of an adjudication, not only in a rulemaking." *Id.* at 894 (citations omitted).  As the court explained, "the nature of adjudication is that similarly situated non-parties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal." *Id*. at 895. It would be highly unusual for an agency to conclude an adjudication without referring to general principles supplied by existing statutes, regulations, or other generally applicable laws. A holding that application of those principles is tantamount to rulemaking would make the agency's "choice between rulemaking and adjudication" a false choice. *NLRB v. Bell Aerospace Co. Div. of Textron Inc.*, 416 U.S. 267, 294 (1974).

30

### 2.    <u>If the Gavin Order Is a Rule, It Is Not a Legislative Rule</u>

Whether proceeding by rule or adjudication, an agency "may not escape the notice and comment requirements [of legislative rulemaking] by labeling a major substantive legal addition to a rule a mere interpretation" of an existing regulation. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000). But that is not what EPA did here.

EPA followed, but did not add to, its regulations when it imposed a specific closure-deadline requirement for Gavin. EPA followed the procedure created in the 2020 Rule itself and issued an adjudicative "decision" on Gavin's application that "contain[ed] the facility's deadline to cease receipt of waste"—a new deadline not prescribed by existing regulations. 40 C.F.R. § 257.103(f)(3)(ii). Gavin's deadline is not an "addition to" the 2020 Rule itself, *Appalachian Power*, 208 F.3d at 1024, but simply a new *consequence* from application of that rule.  It requires EPA to set new deadlines following individualized adjudications for every facility whose owner submits a timely and "complete demonstration" with its application for an extension of the 2020 Rule's default (April 2021) deadline. 40 C.F.R. § 257.103(f)(3)(ii).

Nor did EPA make any "major substantive legal addition" to the 2015 Rule, *Appalachian Power*, 208 F.3d at 1024, by applying straightforward interpretations of the Waste-in-Place Standards to the Gavin facility in the context of an extension

31

application. EPA applied the 2015 Rule's closure standards regarding prevention of releases, infiltration, and impoundment, and the elimination of free liquids, as well as the standards for groundwater monitoring, and concluded that Gavin had not established that these standards were met. Petitioners' arguments that EPA went beyond the existing regulations and issued a new legislative rule are spurious.

Petitioners contend (Br. 42) that, in the Gavin Order, EPA departed from the 2015 Rule—and specifically, Section 257.102(d)—in two primary respects: interpreting the term "free liquid" to include groundwater, and interpreting the term "infiltration" to include lateral flow of groundwater. First, the term "free liquids" is specifically defined by regulation as "liquids that readily separate from the solid portion of a waste under ambient temperature and pressure." 40 C.F.R. § 257.53. The 2015 Rule also defines "groundwater," as "water below the land surface in a zone of saturation." 40 C.F.R. § 257.53. It is beyond reasonable dispute that water, under ambient temperature and pressure, is a liquid. And groundwater, no less than surface water or porewater (water from soils or rock), can readily separate from the solid portion of a waste. JA__ (Gavin Order at 33.). Petitioners provide no plausible argument for how closing a unit with groundwater continuing to flow through it eliminates all free liquids prior to placing a cover on the unit, as is required. 40 C.F.R. § 257.102(d)(2)(i).

Second, the term "infiltration," while not specifically defined by regulation, carries the ordinary meaning of the "permeation of a liquid into something." New Oxford Am. Dictionary (3 Ed. 2015, e-book). Nothing in that definition, or in the text, structure or purpose of the 2015 Rule, suggests a directional limitation on *where* in a waste unit infiltration may occur. Infiltration can occur from any entry and exit point.

Petitioners insist that infiltration only needs to be controlled from above, with a cover system. But this ignores that section 257.102(d)(1)(i) applies to the "unit," not just to the cover system. Petitioners' myopic focus on infiltration also ignores the mandate that closure also address *releases from* the unit. EPA explained that when groundwater continues to flow post-closure throughout an impoundment, saturating 40% of the CCR left in the unit, neither infiltration of liquid into the unit nor releases of CCR and leachate from the unit have been controlled, minimized or eliminated to the maximum extent feasible, as the regulations expressly demand. 40 C.F.R. § 257.102(d)(1)(i); JA__ (Gavin Order at 26-42). Petitioners provide no explanation for how allowing groundwater to flow through an impoundment adequately addresses such releases.

That EPA subsequently proposed (but has not finalized) a rule to specifically define the terms "liquid" and "infiltration" in the CCR regulations does not mean that EPA is unable to interpret those terms without first promulgating a legislative

rule. *Contra* Pet. Br. 42-43. Indeed, when proposing that rule (the Legacy Rule), EPA expressed its "strong[] disagree[ment]" that either term needs express definition, as "the plain text of the regulation already clearly communicates the positions laid out above" regarding groundwater. 88 Fed. Reg. 31,982, 32,026 (May 18, 2023).

Petitioners assert (Br. 43) that EPA's plain-language constructions of "free liquids" and "infiltration" necessitate legislative rulemaking because the Agency has advanced different interpretations of those terms in the past. That is wholly incorrect and Petitioners cite to no such contrary interpretations. But even if EPA had changed course in the Gavin Decision, there is no statutory "right to notice and an opportunity to comment when an agency changes its interpretation of one of the regulations it enforces." *Perez v. Mortgage Bankers Ass'n*, 572 U.S. 92, 102 (2015).

Even (mis)construing the Gavin Order as an interpretive rule, the APA would not have required further process before the rule was issued. *See* 5 U.S.C. § 553(b)(A) (exempting interpretive rules from notice-and-comment). Petitioners claim (Br. 45) that RCRA required that EPA undertake not only notice-and-comment but also other procedures, like consultation with States, before issuing the Gavin Order. But RCRA requires those procedures only for EPA "regulations *containing criteria* for determining which facilities shall be classified as sanitary

landfills and which … as open dumps." 42 U.S.C. § 6944(a) (emphasis added). By definition, an interpretive rule does not itself contain criteria; it interprets criteria contained in other regulations.

Petitioners also suggest that EPA is promulgating a new rule when applying existing standards requiring an entity to preclude the impoundment of water in closing a unit. Pet Br. at ___. EPA explained in the Gavin Order that Section 257.102(d)(1)(ii) requires that unit closure "preclude the probability of future impoundment of water," which requires Gavin to address groundwater in the Fly Ash Reservoir. JA__ (Gavin Order at 29-30, 39). When groundwater remains in – and flows through – the unit after closure, water continues to be impounded. 40 C.F.R. § 257.102(d)(1)(ii); JA___ (Gavin Order at 26-42). Contrary to Petitioners' claims, this standard applies to the entire unit, not merely infiltration of water through the cover. 40 C.F.R. §257.102(d)(1)(ii); EPA *EE-I* Br. at 32-38.[6]

---

[6] In support of their persistent argument that the Waste-in-Place Closure Standards apply only to the cover system, Petitioners assert that "free liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues" "sufficient to support the final cover system." Pet. Br. at 11 (citing 40 C.F.R. §257.102(d)(2) for both quotations that Petitioners collapse  into a single sentence). But these passages are in different regulatory subsections and, in fact, the cited provision declares that "free liquids *must* be eliminated" in an impoundment "*prior to* installing the final cover system." 40 C.F.R. § 257.102(d)(2)(i) (emphasis added). And as coal industry group Electric Power Research Institute explained in 2016, impoundment covers are ineffective in preventing contamination when groundwater is flowing though CCR, which "will generate leachate even in the absence of vertical infiltration." JA__ (Gavin Order at 31-32).

Petitioners argue that "impoundment" in Section 257.102(d)(1)(ii) takes the definition of a "CCR impoundment" provided at Section 257.53. Pet. Br. at 22-23. But Petitioners never explain how applying the definition of a CCR impoundment, rather than the plain meaning of the word impoundment in the phrase "preclude the future probability of impoundment of water," would change the plain meaning of the term. Regulations must be interpreted and applied in context. *Kisor*, 139 S.Ct. at 2415. The mandate of Section 257.102(d)(1)(ii) to "preclude the future probability of impoundment of water" does not preclude the future construction of a CCR impoundment. It precludes water from accumulating in the closed unit. "Impoundment" in Section 257.102(d)(1)(ii) must take its meaning from the general usage definition of the "impound," which is "to confine within an enclosure or limits," as EPA explained in the Gavin Order. JA___ (Gavin Order at 39). *See USWAG, supra* at 454 n. 23 ("The EPA's regulatory definition of "impoundment" is consistent with the dictionary definition of the verb "impound," which manifests continuing action," citing Impound, Webster's Third New International Dictionary 1136 (3d ed. 1993) ("[T]o confine or store (water)[.]")). *See also* EPA Br. in *Electric Energy I* at 27-34.

EPA's interpretation—that Section 257.102(d)(1) bars the closure of the Fly Ash Reservoir while groundwater is continuously flowing in and out of that unit— also comports with *USWAG*'s explanation of RCRA's safety standard. The Court

36

there held that operating an unlined CCR impoundment with the potential to leak violated RCRA's standard that there be "no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility." 901 F.3d at 420 (quoting 42 U.S.C. § 6944(a)). If an unlined impoundment that *could* leak fails RCRA's standard for a sanitary landfill, an unlined impoundment with groundwater flowing into and out of it certainly fails. And Petitioners never explain how Gavin can close an impoundment with CCR sitting in groundwater 64 feet deep, when, as this Court explained in *USWAG*, an impoundment cannot be located with CCR less than five feet *above* groundwater (the aquifer). *USWAG*, 901 F.3d at 442-43.[7]

Ultimately, Petitioners assert that EPA must be amending the regulations because its application would prohibit closure with waste-in-place, which they explain is specifically permitted by the regulations. Petitioners quote from an EPA response to comments on the 2015 Rule where EPA explained that a unit that fails

---

[7] Petitioners imply that because the regulations mandate groundwater monitoring for thirty years after closure, this is the sole regulatory standard addressing protection of groundwater. Pet. Br. at 10-11, citing 40 C.F.R. §257.104(c). This standard, which is in a different section of EPA's regulations, applies *in addition to* the closure standards in Section 257.102(d), not in lieu of them. Petitioners unsurprisingly never explain why EPA would promulgate regulations mandating monitoring for thirty years to ensure that the toxins contained in CCR do not reach groundwater, while allowing a facility to close an impoundment with groundwater coursing through the CCR left in place.

to meet the location criteria "must initiate closure as required under the rule ….

*This rule does not require clean closure of any unit.*" Pet. Br. at 12 (emphasis by

Petitioners). Petitioners argue that the Gavin Order conflicts with this statement

because it required Gavin to pursue only clean closure of the Fly Ash Reservoir.

But EPA has been abundantly clear that clean closure is *not* required and that a unit

may close with CCR in place, so long as its closure meets the Waste-in-Place

Closure Standards in Section 257.102(d). JA\_\_\_ (Gavin Order at 28-30). The

Gavin Order requires nothing more.[8]

> ### 3.    The Gavin Order is Not a "Rule" Even Under the Precedent Relied Upon by Petitioners

Petitioners base their entire argument that the Gavin Order is a legislative

rule on a single case, *American Mining Cong. v. Mine Safety & Health Admin.*, 995

F.2d 1106 (D.C. Cir. 1993), which lists four factors to examine in assessing

---

[8] There is nothing ambiguous about any of the Closure with Waste-in-Place standards. To the extent, however, that any ambiguity is perceived, the Court should defer to EPA's reasonable interpretation of those express provisions. *Kisor*, 139 S. Ct. at 2415-18. Applying the *Kisor* factors required to apply such deference, the Gavin Order is EPA's official position provided after review of Gavin's application and consideration of comments. JA\_ (Gavin Order at 26-42). The Order also reflects EPA's considered expertise on highly technical issues. *See, e.g.*, JA\_\_ (Gavin Order at 16-24, making site-specific technical findings on the amount, height, nature and effects of groundwater continuing to flow into and out of the Fly Ash Reservoir after closure). Finally, EPA's explanation of its own regulations is not only reasonable, it is wholly consistent with decades of consistent guidance EPA has provided on the closure of surface impoundments under RCRA. *See* pp. 50-52, *infra*.

38

whether a rule issued by an agency is a legislative or interpretative rule. Pet. Br. at

39-44. But that skips over the most fundamental problem with Petitioners'

argument: the Gavin Order is not a rule at all, but an order. Nevertheless, EPA

briefly addresses the *American Mining* factors to show why they do not help

Petitioners.

> **a.    The 2015 Rule, Not the Gavin Order, Provides
> the Basis for Application of the Waste-in-Place
> Closure Standards**

As detailed above, it is the 2015 Rule that prohibits Gavin from simply

walking away from its closed impoundment with CCR sitting in groundwater

across its 312-acre footprint. The Gavin Order cites and applies the plain language

of the standards promulgated in the 2015 Rule for every element of the Gavin

Order. *See e.g.*, JA___ (Gavin Order at 24-45). The legislative and regulatory basis

for the closure elements of the Gavin Order is Section 257.102(d).

Petitioners argue that the Gavin Order, not the 2015 Rule, served as the

"legislative basis" for EPA's proposed denial of Alabama's CCR permit program.

Pet. Br. at 40-41. That is incorrect. In reviewing Alabama's program, EPA

identified several state permits that were not as protective as the federal CCR

regulations, as is required for EPA to approve the program. Among these were

permits allowing unlined surface impoundments to close with waste-in-place

without addressing groundwater in the unit. The authorities that EPA cited to

Alabama were the statute and regulations, not the Gavin Order. *See, e.g.*, 88 Fed. Reg. 55,220, 55,224-228, 55,236-238 (Aug. 14, 2023).

EPA cited the Gavin Order not as legal authority for EPA's proposed decision but simply as an example that illustrated how Section 257.102(d) applies to unlined impoundments that contain groundwater. *See, e.g.*, 88 Fed. Reg. at 55,236/1, n.32, 55,237/2, n.37. *See also* Pet. Br. at 41 (quoting EPA as saying that Alabama issued permits that do not comply with "all of the necessary requirements in the Federal regulations"). Each reference cites the operative regulations in explaining why a facility with groundwater flowing through tons of CCR does not comply with  Section 257.102(d), absent engineering solutions to address that situation.

Orders often discuss, apply, and interpret legal standards which may independently apply to future similarly situated actions. This does not result in "a rulemaking disguised as an adjudication." *ITServe All., Inc. v. United States Dep't of Homeland Sec.*, 71 F.4th 1028, 1034 (D.C. Cir. 2023). Indeed, uniform treatment is expected. *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) ("It is axiomatic that '[a]n agency must treat similar cases in a similar manner, unless it can provide a legitimate reason for failing to do so.'"). Merely being the first order to apply regulatory provisions in a given situation (here closure with CCR in place) does not transform that order into a new rule, no matter

40

how many other entities may be subject to application of the same standards. *ITServe All.*, 71 F.4th at 1035 (citing *Nat'l Biodiesel Bd.*, 843 F.3d at 1018) ("[T]he fact that an agency action governs a large number of similar cases carries little weight in deciding whether it is a rule or order.").

In any event, the Gavin Order cannot possibly have been the "legislative basis" for EPA's proposed rejection of Alabama's permit program. EPA notified Alabama of its concerns with the State's interpretation/application of Section 257.102(d) on March 15, 2022, eight months *before* issuing the Gavin Order. 88 Fed. Reg. at 55,224. Accordingly, the first *American Mining* factor is not satisfied.

### b.    EPA Did Not Invoke its Legislative Authority to Create New Standards in the Gavin Order

Turning to the third *American Mining* factor,[9] EPA did not invoke its legislative authority by its references to "achiev[ing EPA's] statutory mandate" and "directly advanc[ing] RCRA's stated regulatory purpose." Pet. Br. at 41-42. Instead, the Gavin Order explains how the existing standards in Section 257.102(d) track RCRA's statutory mandate, and it nowhere invokes legislative authority to promulgate *new* standards. JA___ (Gavin Order at 37-40). Discussing legislative authority supporting *existing* standards is a regular practice of agencies, because

---

[9] Petitioners do not assert that the Gavin Order satisfied the second *American Mining* factor.

agency orders must comply with statutes and regulatory provisions. *See USWAG*, 901 F.3d at 426-30.

Besides explaining the regulatory basis for the Gavin Order, EPA also explained how Petitioners' interpretation clashes with this Court's decision in *USWAG*. EPA explained – and Petitioners do not contest – that it is impossible to reach the conclusion that Gavin's Fly Ash Reservoir impoundment, with groundwater flowing through tons of CCR indefinitely, has "no reasonable probability of adverse effects on health or the environment," 42 U.S.C. §6944(a), when the Court in *USWAG* found that unlined impoundments that were not yet leaking failed to meet this standard. JA___ (Gavin Order at 39-41, quoting *USWAG*, 901 F.3d at 420, 424). EPA's explanation and implementation of regulations consistent with this Court's decisions and the statute do not "invoke its legislative authority" to develop new closure standards.

Petitioners cite (Br. 42) *Conference Group LLC v. FCC*, 720 F.3d 957 (D.C. Cir. 2013), in support of their assertion that EPA was invoking legislative authority to generate new regulatory standards in the Gavin Order. There, the court actually concluded that the agency's explanation of how regulations are applied "was neither a legislative nor an interpretive rule. Rather it was simply an interpretation given in the course of an informal adjudication." *Id.* at 965. So too here, EPA's

42

explanation of how the express closure requirements of Section 257.102(d) apply was "simply an interpretation given in the course of an informal adjudication." *Id*.

The Court in *Conference Group* determined the agency's statement not to be a legislative rule because it "has none of the hallmarks of legislative rulemaking that this court has identified, such as amending a prior legislative rule or explicitly invoking the Commissioner's general legislative authority." *Id*. Nowhere does the Gavin Order invoke EPA's legislative authority to create *new requirements* as the basis for the Order, explicitly or otherwise. Rather, the Order expressly states that "EPA is taking final action to deny the request for an extension to cease receipt of waste for the BAP [Bottom Ash Pond] *pursuant to the authority in 40 C.F.R. § 257.103(f)*." JA___ (Gavin Order at 4) (emphasis added). Throughout, the Order cites to existing regulations, explaining how the plain language of these provisions apply specifically to Gavin. The unsurprising fact that those provisions may apply similarly at other facilities, does not transform the Gavin-specific Order into a legislative rule. *Conference Group*, 720 F.3d at 966 ("[T]he 'fact that an order rendered in an adjudication may affect agency policy and have general prospective application' … does not make it rulemaking subject to APA Section 553 notice and comment.").

43

c.    **The Gavin Order Does Not Amend the Regulatory Text**

Turning to the fourth *American Mining* factor, Petitioners assert that the Gavin Order "effectively amends the existing regulatory text" by redefining the terms "infiltration" and "free liquids."  Pet. Br. 42-44. As outlined above, EPA merely applied the ordinary meaning of infiltration and regulatory definition free liquids.

As supposed proof of their assertion, Petitioners cite to EPA's *proposed* Legacy Rule, in which, to respond to the *USWAG* decision, EPA proposed  to apply existing regulatory standards to legacy impoundments (inactive impoundments at inactive facilities). 88 Fed. Reg. 31,982 (May 18, 2023). Petitioners argue that EPA's proposal in the proposed Legacy Rule to define "liquid" and "infiltration" in the CCR regulations shows EPA amended Section 257.102(d) in the Gavin Order. Pet. Br. at 42-44, citing 88 Fed. Reg. at 32,025-26. But this mischaracterizes EPA's proposal.

In the proposed Legacy Rule EPA explained that the existing regulatory standard to eliminate free liquids from an unlined impoundment under Section 257.102(d)(2)(i) applies to all liquids, from any source, and includes groundwater. 88 Fed. Reg. at 31,992-93, 32,025-26. EPA further explained that the existing standard to prohibit infiltration of liquids into an impoundment applies to

44

infiltration from any direction, including from groundwater. *Id*. These are the same positions that EPA has consistently espoused for years.

While EPA strongly disagreed that the terms "liquid" and "infiltration" need further regulatory definition (*see* quotations, *supra*), it did not obstinately ignore commenters' (Petitioners') requests. EPA requested comment on whether it would be useful to nevertheless include specific regulatory definitions of these terms. *Id*. at 31,993/1, 32,026/1. The possibility that specific definitions might prove useful to regulated entities in processing what already is required under existing regulations does not suggest that the Gavin Order amended the 2015 Rule.[10]

Ultimately, Petitioners' issue with the Gavin Order is a dispute about what Section 257.102(d) requires and how it applies to Gavin, not whether EPA amended the regulation. *See* Pet. Br. at 53 (noting that review of EPA's compliance assessment is about "application of [a] regulation to a specific facility"). Petitioners disagree with EPA's application of Section 257.102(d) in the

---

[10] Petitioners state that "[i]n the Legacy Proposal, EPA cited the Final Gavin Denial as authority for the agency's position." Pet. Br. at 25-26, citing 88 Fed. Reg at 31,992-95, regarding the elimination of free liquids. EPA did no such thing. In the pages of the proposed Legacy Rule cited by Petitioners, EPA methodically identified applicable regulatory requirements, e.g., Section 257.102(d)(2)(i), as the basis for EPA's position on what is required. EPA cited the Gavin decision once, as a "See also" reference, after EPA explained the actual regulatory requirements and cited a 1982 reference. 88 Fed. Reg. at 31,993/1. And this is the only time the Gavin Order is cited in the 89-page proposed Legacy Rule.

Gavin Order. But disagreement with how EPA applied those standards does not transform EPA's adjudication of Gavin's extension request into a legislative rule. *Nat'l Biodiesel Bd.*, 843 F.3d at 1018.[11]

### B.    The Gavin Order Should Be Upheld Even If It Is a Legislative Rule, as There is no Prejudicial Error

When considering whether the Gavin Order issued "without observance of procedure required by law," this Court must take "due account … of the rule of prejudicial error." 5 U.S.C. § 706; *see Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n* ("*WCMA*"), 82 F.4th 1273, 1284 (D.C. Cir. 2023). As to the APA's notice-and-comment requirement (and RCRA's parallel requirement for sanitary-landfill criteria), EPA *did* provide notice of its proposed decision and opportunity for public comment, and Petitioners and others submitted comments considered by EPA, including on the issues presented to this Court. There is no reason to believe Petitioners "ha[d] something useful to say" on those issues that remained unsaid in their comments on the proposed Gavin denial. *WCMA*, 82 F.4th at 1285. As to RCRA's additional procedural requirements for sanitary-landfill criteria, Petitioners do not establish that a "public hearing" would meaningfully

---

[11] Petitioners assert that EPA failed to satisfy procedural requirements for issuing a legislative rule. Pet. Br. at 44-46. EPA did not implement such procedures because the Gavin Order is not a legislative rule. The procedural requirements cited, such as notifying Congress, do not apply to issuance of an adjudicative order, but only to "proposed regulations." *See* Pet. Br. at 9.

46

have altered their input on EPA's proposed decision, or that "consultation with States" (rather than Petitioners) would change the calculus. 42 U.S.C. § 6944(a).

Moreover, Petitioners have advanced no argument with respect to the Gavin Order's reliance on the 2015 Rule's bar on closure where the operator fails to "control, minimize or eliminate to the maximum extent feasible" releases from an impoundment. They do not argue that this regulatory prohibition on releases was unclear or that the Fly Ash Reservoir satisfies this standard. Gavin's failure to "control, minimize or eliminate to the maximum extent feasible" all releases from the impoundment to groundwater was an independent basis for denial of Gavin's extension application. 40 C.F.R. § 257.102(d)(1)(i). Any error by EPA in not treating *alternative* bases for its decision as requiring promulgation of a legislative rule is therefore harmless.

## III.    THE 2015 RULE AND EPA GUIDANCE PROVIDED FAIR NOTICE OF THE WASTE-IN-PLACE CLOSURE STANDARDS_____

EPA provided Petitioners sufficient notice that a facility cannot close an unlined impoundment with CCR saturated with groundwater. The text of the 2015 Rule's Waste-in-Place Closure Standards, 40 C.F.R. 257.102(d), along with EPA's proposed denial decision, made this clear to Gavin and all the Petitioners, as did the Agency's settled interpretation of similar rules governing closures of hazardous waste impoundments. Petitioners had fair notice of the regulatory standards that would apply to them.

47

Petitioners assert (Br. 46-48) that EPA violated their due process rights by: (a) failing to give them fair notice of the Agency's purported change in position; and (b) failing to consider Petitioners' reliance on EPA's supposed contrary former position. Petitioners further argue (Br. 50) that "EPA's position threatens to impose retroactive liability on regulated parties who lacked fair notice."

To determine whether a party had fair notice regarding the requirements of a regulation, this Court first considers whether the party received notice "in the most obvious way of all: by reading the regulations." *Howmet Corp. v. EPA*, 614 F.3d 544, 553 (D.C. Cir. 2010). *See also* EPA Br. 64-65, *Electric Energy I* (citing cases). As detailed above, the conclusion that a facility cannot close with waste-in-place without addressing groundwater flowing into and out of the unit is simply a straightforward application of 40 C.F.R. §257.102(d). Petitioners' contrary view misreads the regulations.

More generally, a reliance interest may be implicated if an agency issues a policy, a party takes an action based on that policy, and the agency subsequently changes its policy. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Here, EPA never changed its position, so there was no new position to provide notice of, and there can be no legitimate reliance on a non-existent past position.

48

Petitioners' brief, as does their brief in *Electric Energy I*, fails to cite a single instance where EPA had previously explained that: (a) groundwater was not a free liquid or did not have to be eliminated prior to closing; or (b) infiltration cannot occur from groundwater; or (c) groundwater flowing through a closed, unlined unit full of CCR will not result in releases of leachate into the groundwater; or (d) closing a facility with groundwater continually flowing through CCR will ensure that water is not impounded in the unit in the future; or (e) Section 257.102(d) permits a surface impoundment to close solely by installing a cover system, leaving groundwater to continuously flow through CCR remaining in the closed unit.

In their only attempt to cite to *any* purported contrary application by EPA, Petitioners, using partial quotes they piece together, assert that EPA's position in the Gavin Order "conflicts with its prior description of the term 'infiltration' as applying 'only' to 'percolation' 'through the cap.'" Br. at 43, citing JA___ (Risk Assessment at K-1). For support, Petitioners cite a passage from EPA's risk assessment for the 2015 Rule. *Id*. But that passage describes an inapposite situation in which the facility had closed in accordance with Section 257.102(d), and it is only then, after both "removal of free liquids and capping during closure … is

49

complete [that] infiltration through the impoundments is driven only by percolation of incident precipitation through the cap." JA___ (Risk Assessment at K-1).[12]

EPA's historic application of the closure provisions and similar regulations has comported with its application of Section 257.102(d) in the Gavin Order. As early as 1982, EPA adopted standards for closing hazardous waste impoundments that involved removing free liquids, preventing liquids from entering the closed unit, and controlling releases from the closed unit. EPA Br. 30-32, *Electric Energy I*. EPA modeled Section 257.102(d) in part on these existing standards. *Id*. EPA further explained in 1982 that an entity must act to prevent toxic constituents from leaching out of an impoundment through liquids, specifically citing groundwater moving into and out of the unit as a cause for such occurrences. *Id.* (citing 1982 Guidance). EPA reiterated those positions in 1985 and 1988. *See* 50 Fed. Reg. 11,068, 11,070 (March 19, 1985); JA__ (Regulatory Interpretation of the Closure Performance Standard, OSWER Directive # 9476.00-13 (February 8, 1988)).

EPA made clear its intention to require CCR impoundments to address groundwater in a unit to close with waste-in-place like hazardous waste surface impoundments under Subtitle C. In 2010, EPA proposed to either (1) regulate CCR under Subtitle C, which would have applied the Subtitle C closure standards

---

[12] Petitioners cite three references in their standing declarations for supposed reliance. Pet. Br. at 50. None refer to any past contrary statement by EPA regarding the application of any regulatory standard, closure or otherwise.

directly to CCR impoundments, 75 Fed. Reg. 35,128, 35,182 (June 21, 2010), or

(2) incorporate RCRA Subtitle C closure standards applicable to interim status

hazardous waste surface impoundments into the Subtitle D rule for CCR surface

impoundments. *See, e.g.*, 75 Fed. Reg. at 35,193, 35,208 (June 21, 2010). EPA was

clear again in 2015 when it selected the Subtitle D option and adopted the Part 265

hazardous waste standards with minor changes, none of which made the

performance standards less stringent. 80 Fed. Reg. 21,409, 21,414; JA___ (Gavin

Order at 87). *See also* Intervenors' Br. 36-39, *Electric Energy I*, Doc. 2024250

(citing similar historical EPA statements).

Likewise, in a 2020 regulatory preamble (not for the 2020 Rule) relating to

procedures for impoundments to operate with an alternative liner, EPA explained

that a "CCR surface impoundment that extends into the groundwater table will

need to include measures to comply with [Section 257.102(d)(1)(i)] and other

closure performance standards." 85 Fed. Reg. 12,456, 12,464/2 (Mar. 3, 2020).

And others in the industry fully understood the reach and application of the

existing regulatory provisions. *See, e.g.*, JA___ (Gavin Order at 88) (explaining

that Duke Energy Company, a recipient of an EPA document challenged in

*Electric Energy I*, had told State regulators that "closure performance standards

prohibit closure-in-place where groundwater is in actual or likely contact with the

51

CCR unless effective engineering measures can be installed to control, minimize, or eliminate such conditions.").

If all the above were not sufficient notice, EPA issued an 89-page proposed denial decision detailing its views on Gavin's obligations under existing regulatory standards to address groundwater still in the Fly Ash Reservoir impoundment. JA__ (Gavin Order at 85-86). The Due Process Clause required nothing more.

## IV.    EPA HAD TO INDEPENDENTLY DETERMINE WHETHER GAVIN DEMONSTRATED COMPLIANCE WITH ALL REGULATIONS

Petitioners do not contest EPA's substantive findings that Gavin failed to demonstrate compliance with the Waste-in-Place Closure Standards of 40 C.F.R. § 257.102(d) or the monitoring/sampling standards of 40 C.F.R. §§ 257.91-94. Petitioners argue instead (Br. 53-56) that the Gavin Order must be vacated because the regulations require a qualified professional engineer to certify compliance, and EPA did not affirmatively announce that Gavin could not rely on self-certifications to demonstrate compliance. That argument is plainly wrong and, if accepted, would neuter EPA's enforcement authority.

The 2020 Rule allowed an entity to seek an extension for initiating closure if developing alternative disposal capacity was infeasible by April 11, 2021, provided the facility complied with all standards in Part 257. 40 C.F.R. § 257.103(f)(1). In an extension application, a facility had to "demonstrate"—not just certify—its

52

compliance with all CCR regulations. 40 C.F.R. § 257.103(f)(1)(iii); *see also id.*

§ 257.103(f)(1)(viii) (owner/operator bears the burden of establishing compliance);

JA__ (Gavin Order at 13-14) (same). Facilities had to submit numerous documents

to demonstrate compliance, most of which would be unnecessary if EPA intended

to rely merely on engineer certification. 40 C.F.R. § 257.103(f)(1)(iv)(B); 85 Fed.

Reg. 53,543/3 (Aug. 28, 2020). After a facility submits a complete demonstration,

EPA must independently assess facility compliance. *Id.* § 257.103(f)(1)(iii),

(1)(iv)(B), (3).

EPA explained this in the preamble to the 2020 Rule: "EPA must be able to

affirmatively conclude that the facility meets [the compliance] criterion prior to

authorizing any continued operation of the unlined impoundment." 85 Fed. Reg. at

53,543/2-3. EPA further explained that it "will review a facility's current

compliance with the requirements governing groundwater monitoring systems,"

and identified specific documents required for EPA to assess compliance with the

groundwater monitoring regulations. *Id.* EPA advised that it "will document the

results of its [compliance] review and that record will be available for public

comment." *Id*. Thus, Gavin has been on notice since before it submitted its

application that its engineer's compliance certification is insufficient to

"demonstrate" regulatory compliance, as is required to obtain the requested

extension. *Id.* (discussing USWAG's comments that facilities "acting in good faith" might nevertheless be found noncompliant by EPA).

Even setting aside how it founders on the express text of Section 257.103(f), no other regulatory provision supports Petitioners' claim that the opinion of a company engineer that a facility complies with all regulatory standards bars EPA from reaching a different conclusion. CCR regulations require a facility to obtain compliance certifications for many regulatory standards. *E.g.*, 40 C.F.R. § 257.102(d)(3)(iii) (requiring certification of compliance for final cover system design); *id.* § 257.91(f) (requiring certification of compliance for groundwater monitoring system). EPA made clear even in the 2015 Rule that it would not rely exclusively on engineer certification to ensure compliance with technical standards, but that other mechanisms also existed to ensure compliance. 80 Fed. Reg. at 21,312, 21,334-35.

Because EPA did not have enforcement authority in 2015, enforcement was left to States and citizens under 42 U.S.C. § 6972(a)(1)(A). 80 Fed. Reg. at 21,309. To facilitate such enforcement, EPA required engineer certifications and other data to be posted to the internet, as this would allow states and the public to evaluate the accuracy of the certifications in assessing whether to sue. *Id.* at 21,335. The certifications do not act as prohibitions on state or citizen enforcement. And they

certainly do not bar EPA using its WIIN Act authority to enforce standards in the regulations.

Petitioners concede (Br. 8) that "EPA can enforce" its CCR regulations but insist (Br. 55) that EPA is bound by certifications from company engineers unless the Agency first establishes its own permit program. Nothing in the statute requires this result. To the contrary, RCRA allows EPA to "enforce the prohibition on open dumping," both in "a nonparticipating State" (i.e., a State without a permit program) and "in a State that is approved to operate a permit program." 42 U.S.C. § 6945(d)(4). Nothing in RCRA or EPA's regulations states or implies that a regulated party's engineer's compliance certification binds EPA in exercising its RCRA authority and duties.[13] Because Petitioners have not otherwise challenged EPA's substantive determinations that Gavin failed to comply with the identified regulations, the petitions for review should be denied.

## **CONCLUSION**

For the foregoing reasons, the Petitions should be denied.

Respectfully submitted,

---

[13] Petitioner USWAG acknowledges this. In a 2017 petition, USWAG explained that once the certifications are posted to the facility's website, the "certification is then subject to review by EPA, the states, and citizen groups and, if there is disagreement, the facility's compliance with the Rule can be challenged by EPA through an EPA administrative enforcement order or through a RCRA citizen suit brought by a citizen group or a state in federal district court." JA_ (Gavin RTC at 180).

OF COUNSEL:

LAUREL CELESTE
U.S. Environmental Protection Agency
Office of General Counsel
William Jefferson Clinton Building
1200 Pennsylvania Ave., NW
Mail Code 2344A
Washington, D.C. 20460
Tel: (202) 564-1751

DATE: Nov. 17, 2023

TODD KIM
Assistant Attorney General
Environment & Natural Resources Div.

/s/ *Perry M. Rosen*
PERRY M. ROSEN
DAVID MITCHELL
United States Department of Justice
Environment & Natural Resources Div.
Environmental Defense Section
P.O. Box 7611
Washington D.C.  20044
Tel: (202) 353-7792

Counsel for Respondents

## CERTIFICATE OF COMPLIANCE UNDER FED. R. APP. P. 37(A)(7)(b)

I hereby certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32 (a)(7)(B) and this Court's briefing order because this brief

contains 12,741 words, excluding the parts of the brief exempt under Fed. R. App.

P. 32 (a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6)

because the brief was prepared in proportionally spaced typeface using Microsoft

Word 14-point Times New Roman type.

Date: Nov. 17, 2023                    /s/   *Perry M. Rosen*
                                       Perry M. Rosen
                                       Counsel for Respondents


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief of Respondent Environmental

Protection Agency was electronically filed with the Clerk of the Court using the

CM/ECF system, which will send notification of said filing to the attorneys of

record for Petitioners and all other parties, who have registered with the Court's

CM/ECF system.

Date: Nov. 17, 2023                    /s/   *Perry M. Rosen*
                                       Perry M. Rosen
                                       Counsel for Respondents

# Exhibit A



# SITE-SPECIFIC ALTERNATIVE DEADLINE DEMONSTRATION TO INITIATE CLOSURE OF CCR SURFACE IMPOUNDMENT

Gavin Plant Bottom Ash Pond

30 November 2020