ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1035 (Consolidated with Nos. 23-1036, 23-1037, and 23-1038)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ELECTRIC ENERGY, INC., *ET AL.,*
*Petitioners,*
*v.*
ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN,
ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY,
*Respondents.*

---

Petitions for Review of Action of the
United States Environmental Protection Agency

---

**RESPONDENT-INTERVENOR SIERRA CLUB'S BRIEF**

---

Thomas Cmar
Gavin Kearney
Jennifer Cassel
Gilbert Zelaya
Lisa Evans
Earthjustice
311 South Wacker Dr., Ste. 1400
Chicago, IL 60606
(215) 717-4520

*Counsel for Sierra Club*

December 8, 2023

# CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Cir. Rule 28(a)(1), Respondent-Intervenor certifies as follows:

## A. Parties, Intervenors, and *Amici Curiae*

Petitioners: Petitioners in Case No. 23-1035 are Electric Energy, Inc., Luminant Generation Company, LLC, Coleto Creek Power, LLC, Miami Fort Power Company, LLC, Zimmer Power Company, LLC, Dynegy Midwest Generation, LLC, Illinois Power Generating Company, Illinois Power Resources Generating, LLC, and Kincaid Generation, LLC.

Petitioner in Case No. 23-1036 is Utility Solid Waste Activities Group.

Petitioners in Case No. 23-1037 are Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Public Service Company of Oklahoma, Southwestern Electric Power Company, and Wheeling Power Company.

Petitioner in Case No. 23-1038 is Gavin Power, LLC.

Respondents: United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency.

Respondent-Intervenor: Sierra Club.

*Amici Curiae*: There are no *amici curiae* at the time of this filing.

**B. Rulings Under Review**

Petitioners challenge EPA's "Denial of Alternative Closure Deadline for General James M. Gavin Plant, Cheshire, Ohio". EPA-HQ-OLEM-2021-0590-0100 (Nov. 18, 2022).

**C. Related Cases**

Case No. 22 -1056, *Electric Energy, Inc., et al. v. EPA, et al.* (*Electric Energy I),* has been coordinated with this case and is to be argued before the same panel and on the same day as the present matter. Order, Doc. 2002545 (June 7, 2023).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY................................................................................. viii

PRELIMINARY STATEMENT ...........................................................1

STATUTES AND REGULATIONS......................................................3

JURISDICTIONAL STATEMENT .......................................................3

STATEMENT OF ISSUES ................................................................4

STATEMENT OF THE CASE.............................................................4

A.   IMPROPER COAL ASH DISPOSAL DAMAGES HUMAN HEALTH AND
     THE ENVIRONMENT. ...........................................................4

B.   PREVENTING AND CLEANING UP GROUNDWATER
     CONTAMINATION ARE PRIMARY GOALS OF RCRA AND THE CCR
     RULE. .............................................................................6

     1.   RCRA requires EPA to protect human health and the environment
          from the harms of improper solid waste disposal, including
          groundwater contamination.........................................6

     2.   The CCR Rule establishes clear standards to protect groundwater from
          coal ash contamination. ............................................7

     3.   The CCR Rule includes clear standards to protect groundwater during
          and after CCR unit closure. .......................................8

     4.   The CCR Rule and subsequent Improvements Act establish several
          mechanisms to ensure compliance. ...............................10

     5.   In its 2018 *USWAG* decision, this Court vacated and remanded key
          provisions of the 2015 CCR Rule that failed to protect human health
          and the environment as required by RCRA. ....................11

     6.   The 2020 Part A rulemaking created the extension process at issue in
          the present matter. ................................................12

C.   GAVIN POWER SUBMITTED AN APPLICATION SEEKING TO
     EXTEND THE CLOSURE INITIATION DEADLINE FOR ITS BOTTOM
     ASH POND...........................................................................13

i

D.  EPA ISSUED A FINAL ORDER DENYING GAVIN POWER'S PART A APPLICATION. .........................................................................15

SUMMARY OF ARGUMENT ...............................................................16

STANDARD OF REVIEW .....................................................................19

ARGUMENT ..........................................................................................20

I.  THE GAVIN ORDER IS CONSISTENT WITH THE PLAIN LANGUAGE OF THE CCR RULE AND PROMULGATES NO NEW REGULATION. .20

  A.  The CCR Rule establishes clear and distinct closure standards for an entire CCR unit and for a final cover. ..................................................21

    1.  EPA does not require only excavation to achieve compliance with the Rule's performance standards when groundwater is present. ..................................................................................................25

    2.  The CCR Rule's groundwater protections are consistent with decades of EPA guidance. ...........................................................26

  B.  Petitioners' rewriting of the CCR Rule would be unreasonable and violate RCRA. ........................................................................................29

  C.  The Gavin Order does not constitute legislative rulemaking. ............30

II.  EPA ACTED REASONABLY AND LAWFULLY WHEN IT DETERMINED THAT GAVIN POWER HAD FAILED TO DEMONSTRATE COMPLIANCE WITH THE CCR RULE......................33

III.  PETITIONERS HAVE NO RELIANCE INTEREST IN THEIR INACCURATE CHARACTERIZATION OF THE CCR RULE.................35

  A.  Petitioners cannot rely on their own misinterpretation of existing requirements. ..........................................................................................35

  B.  EPA's request for comment on whether it should define already clear terms reflects industry intransigence, not Rule ambiguity.................37

CONCLUSION ........................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Mining Congress v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993) ...................................................................31, 32

*Barlow v. United States*,
    7 Pet. 404 (1833) ...................................................................................36

*Bd. Of Educ. of Gallup-McKinley Cnty. Sch. v. Native Am. Disability Law Center, Inc.*,
    959 F.3d 1011 (10th Cir. 2020) .............................................................37

*Cheek v. United States*,
    498 U.S. 192 (1991) ...............................................................................36

*Cox v. City of Dallas*,
    256 F.3d 281 (5th Cir. 2001) .................................................................36

*FTC v. Tarriff*,
    584 F.3d 1088 (D.C. Cir. 2009) ............................................................37

*Glycine & More, Inc. v. United States*,
    880 F.3d 1335 (Fed. Cir. 2018) ............................................................37

*Huashan Zhang v. United States Citizenship & Immigr. Servs.*,
    344 F.Supp.3d 32 (D.D.C. 2018) ..........................................................37

*Huashan Zhang v. United States Citizenship & Immigr. Servs.*,
    978 F.3d 1314 (D.C. Cir. 2020) ............................................................37

*Jerman v. Carlisle*,
    559 U.S. 573 .........................................................................................36

*Kisor v. Wilkie*,
    139 S.Ct. 2400 (2019) ....................................................................19, 37

*United States v. Aceto Agric. Chem. Corp.*,
    872 F.2d 1373 (8th Cir. 1989) ..............................................................36

iii

*United States v. Allegan Metal Finishing Co.*,
    696 F.Supp. 275 (W.D. Mich. 1988) ....................................................36

*United States v. Northeastern Pharm. & Chem. Co.*,
    810 F.2d 726 (8th Cir. 1986) ..............................................................36

*United States v. Ottati & Goss, Inc.*,
    630 F.Supp. 1361 (D.N.H. 1985)........................................................36

*United States v. Ottati & Goss, Inc.*,
    900 F.2d 429 (1st Cir. 1990)...............................................................36

*United States v. Production Plated Plastics, Inc.*,
    742 F.Supp. 956 (W.D. Mich. 1990) ..................................................36

*United States v. Production Plated Plastics, Inc.*,
    955 F.2d 45 (6th Cir. 1992) ................................................................36

*Util. Solid Waste Activities Grp. v. Env't Prot. Agency*,
    901 F.3d 414 (D.C. Cir. 2018)..........................................5, 11, 12, 30

*Zands v. Nelson*,
    797 F. Supp. 805 (S.D. Cal. 1992)......................................................36

## Statutes

5 U.S.C. § 706(2)(A).............................................................................19

42 U.S.C. § 6901..................................................................................6

42 U.S.C. § 6901(b)(4)..........................................................................7

42 U.S.C. § 6902(a)(3)...........................................................................6

42 U.S.C. § 6902(a)(4)...........................................................................6

42 U.S.C. § 6902(a)(8)...........................................................................6

42 U.S.C. § 6944(a) .........................................................................7, 30

42 U.S.C. § 6945(d)(1)(B)(ii) ..............................................................11

42 U.S.C. § 6945(d)(4)..................................................................11

42 U.S.C. § 6972(a)(1)(A) ...........................................................10

42 U.S.C. § 6976(a)(1)..................................................................3

Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, 130
    Stat. 1628 (2016) (codified at 42 U.S.C. § 6945(d)). .........................11

## Federal Regulations

40 C.F.R. § 257.1(a)(1) ................................................................9

40 C.F.R. § 257.2 ..........................................................................9

40 C.F.R. § 257.53 .....................................................................8, 22

40 C.F.R. § 257.102 ......................................................................8

40 C.F.R. § 257.102(b)(4)..............................................................33

40 C.F.R. § 257.102(d)(1)..............................................................23

40 C.F.R. § 257.102(d)(1)(i) ...........................................9, 17, 24, 26

40 C.F.R. § 257.102(d)(1)(ii) ..........................................................9

40 C.F.R. § 257.102(d)(2)................................................9, 21, 23, 26

40 C.F.R. § 257.102(d)(2)(i) ......................................9, 17, 21, 22, 23

40 C.F.R. § 257.102(d)(2)(ii)....................................................22, 23

40 C.F.R. § 257.102(d)(3)................................................9, 10, 24

40 C.F.R. § 257.102(d)(3)(i) ...........................................................10

40 C.F.R. § 257.102(d)(3)(i)(B)......................................................24

40 C.F.R. § 257.102(d)(3)(iii).........................................................33

40 C.F.R. § 257.103(a)(1)(i) ...........................................................13

40 C.F.R. § 257.103(a)(1)(iii) ...........................................................13

40 C.F.R. § 257.103(f)(1)(iii) ...........................................................15

40 C.F.R. § 257.103(f)(1)(vi) .............................................................4

40 C.F.R. § 257.103(f)(1)(viii) .........................................................34

40 C.F.R. § 257.103(f)(3)(ii) ............................................................34

40 C.F.R. § 257.103(f)(3)(iii) ...........................................................13

40 C.F.R. § 257.103(f)(3)(iv) ............................................................13

40 C.F.R. § 260.10 .............................................................................22

40 C.F.R. § 257.102(a) .......................................................................21

40 C.F.R. § 257.102(d)(1) ..............................................................9, 26

**Federal Register**

Alabama: Denial of State Coal Combustion Residuals Permit Program, 88 Fed. Reg. 55,220 (Aug. 14, 2023) ..............................................................32

*Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities*, 80 Fed. Reg. 21,302, 21,303 (Apr. 17, 2015)... ....................................................................... 4, 5, 6, 7, 8, 10, 34, 35, 41

*Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; A Holistic Approach to Closure Part A: Deadline To Initiate Closure*, 85 Fed. Reg. 53,516 (Aug. 28, 2020)................12

Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Legacy CCR Surface Impoundments, 88 Fed. Reg. 31,982 (May 18, 2023). .................................................38, 39, 40

*Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals From Electric Utilities*, 75 Fed. Reg. 35,128 (June 21, 2010) ....................................................5

Hazardous Waste Management System; Standards Applicable to Owners and
Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities; and
EPA Administered Permit Programs, 47 Fed. Reg. 32,274 (July 26, 1982)......27

# GLOSSARY

| | |
|---|---|
| CCR, coal ash | Coal combustion residuals |
| CCR Rule | *Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities*, 80 Fed. Reg. 21,302 (Apr. 17, 2015) |
| Doc. | Document |
| EPA | Environmental Protection Agency |
| Gavin Order | Final Decision: Denial of Alternative Closure Deadline for General James M. Gavin Plant, Cheshire Ohio, Docket ID No. EPA-HQ-OLEM-2021-0590-0100 (Nov. 18, 2022) |
| Gavin Plant | General James M. Gavin Plant |
| Improvements Act | Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, 130 Stat. 1628 (2016) (codified at 42 U.S.C. § 6945(d)) |
| JA | Joint Appendix |
| Part A application | Gavin Power, LLC, Site-Specific Alternative Deadline Demonstration to Initiate Closure of CCR Surface Impoundment, Gavin Plant Bottom Ash Pond, Docket ID No. EPA-HQ-OLEM-2021-0590-0003 (Nov. 30, 2020) |
| Part A regulations | Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; A Holistic Approach to Closure Part A: Deadline To Initiate Closure, 85 Fed. Reg. 53,516 (Aug. 28, 2020) |
| Proposed Gavin Order | Proposed Decision: Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant, Docket ID No. EPA-HQ-OLEM-2021-0590-0002 (Jan. 11, 2022) |
| RCRA | Resource Conservation and Recovery Act |

viii

*USWAG*        *Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414 (D.C. Cir. 2018)

## PRELIMINARY STATEMENT

Gavin Power, LLC owns and operates the General James M. Gavin Plant ("Gavin Plant"). The Gavin Plant is a coal-fired electric generating plant that generates coal combustion residuals ("CCR" or "coal ash") managed and disposed of on-site. The Gavin Plant has a Bottom Ash Pond that contains and continues to receive CCR, covers 57.8 acres, and is unlined. This pond was dug into the ground between 1971 and 1974[1] and sits immediately adjacent to the Ohio River.[2] The Gavin Plant contains two additional CCR units: the Stingy Run Fly Ash Reservoir, a 300-acre unlined impoundment that Gavin Power closed with waste-in-place on July 30, 2021; and a CCR landfill that receives flue gas desulfurization materials. JA__ (Final Decision: Denial of Alternative Closure Deadline for General James M. Gavin Plant, Cheshire Ohio, at 11, Docket ID No. EPA-HQ-OLEM-2021-0590-0100 (Nov. 18, 2022) ("Gavin Order")).

On November 30, 2020, Gavin Power submitted an application to Environmental Protection Agency ("EPA") under the agency's Part A regulations seeking additional time to close the Bottom Ash Pond while it sought alternative

---

[1] JA__ (Gavin Power, LLC, Site-Specific Alternative Deadline Demonstration to Initiate Closure of CCR Surface Impoundment, Gavin Plant Bottom Ash Pond, at 15–16, Docket ID No. EPA-HQ-OLEM-2021-0590-0003 (Nov. 30, 2020) ("Part A application")).

[2] JA__ (Part A application, Appendix A, Figs. 2-2 and 3-1, Docket ID No. EPA-HQ-OLEM-2021-0590-0004).

1

disposal capacity for the CCR and other waste streams the pond receives.[3] On January 11, 2022, EPA proposed to deny Gavin Power's extension application, finding that the facility had failed to demonstrate compliance with several federal regulatory requirements governing CCR disposal as required for an extension.[4] On November 18, 2022, after notice and a public comment period, during which Petitioners, Sierra Club, and other entities submitted comments, EPA issued a final order denying Gavin Power's application for a closure extension and requiring Gavin Power to initiate closure of the Bottom Ash Pond within 135 days. JA__ (*Id.*).

Petitioners' challenge to the Gavin Order exemplifies industry efforts to walk away from coal ash that risks contaminating groundwater in perpetuity. In support of this effort, Petitioners make several meritless claims that ignore and misconstrue CCR Rule provisions. Petitioners also urge this Court to adopt an erroneous reading of the CCR regulations that would make power plant owners the arbiters of their own compliance and to grant them a "reliance interest" in their self-serving and inaccurate CCR Rule interpretations.

---

[3] JA__ (Gavin Order at 10).
[4] JA__ (Proposed Decision: Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant, Docket ID No. EPA-HQ-OLEM-2021-0590-0002 (Jan. 11, 2022) ("Proposed Gavin Order")).

EPA's denial order simply requires that Gavin Power commence closure of its Bottom Ash Pond by April 12, 2023, given its failure to comply with applicable regulations. JA___ (*Id.* at 79–80). It is not a legislative rule. EPA's findings of non-compliance in the Order are based on careful, plain-language application of the CCR Rule to site-specific conditions at the Gavin Plant. Both the CCR Rule and subsequent Part A amendment make clear that EPA did not intend for facility owners' use of qualified professional engineers to function as a delegation of the agency's authority or as the sole means for determining compliance. Petitioners have no legitimate reliance interest in their own misinterpretation of the CCR Rule.

This Court should uphold the Gavin Order in its entirety.

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in the Addenda to the parties' briefs.

## JURISDICTIONAL STATEMENT

Pursuant to the Resource Conservation and Recovery Act ("RCRA"), this Court has jurisdiction to review EPA actions "promulgating any regulation, or requirement." 42 U.S.C. § 6976(a)(1). The agency decision challenged by Petitioners promulgates a new requirement—i.e., that Gavin Power initiate closure

of its Bottom Ash Pond by April 12, 2023. As a result, this Court has jurisdiction to review EPA's action.[5]

## STATEMENT OF ISSUES

1. Does the Gavin Order constitute a rulemaking where the decision is consistent with the plain language of existing regulatory obligations?

2. Did EPA act reasonably when it denied Gavin Power's Part A application due to the application's clear failure to satisfy several regulatory requirements for an extended closure deadline?

3. Do Petitioners have a reliance interest in their inaccurate characterization of agency regulations?

## STATEMENT OF THE CASE

### A.    IMPROPER COAL ASH DISPOSAL DAMAGES HUMAN HEALTH AND THE ENVIRONMENT.

Coal ash is "one of the largest industrial waste streams generated in the U.S.," with over 110 million tons created by coal combustion in 2012 alone. *Hazardous and Solid Waste Management System; Disposal of Coal Combustion*

---

[5] As EPA states, the Gavin Order lifts the April 2021 deadline "for good" and imposes a new "requirement" in the form of a site-specific cease receipt date. JA__ (Resp. Br. at 20). The Part A regulations establish a "[m]aximum time frame[]" for unlined surface impoundments to cease receiving waste, 40 C.F.R. § 257.103(f)(1)(vi), while authorizing EPA to require an earlier date based on its evaluation of an application.

4

*Residuals from Electric Utilities*, 80 Fed. Reg. 21,302, 21,303 (Apr. 17, 2015) ("CCR Rule"); *see also Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 420 (D.C. Cir. 2018) ("*USWAG*"). Coal naturally contains heavy metals and metal compounds—such as arsenic, boron, cadmium, chromium, lead, mercury, selenium, and thallium—that become concentrated in coal ash. *USWAG*, 901 F.3d at 421 (citing 80 Fed. Reg. at 21,449). For decades, the prevailing industry practice was to dispose of coal ash in unlined surface impoundments and landfills. 80 Fed. Reg. at 21,324. Water conveyed coal ash from power plants to unlined impoundments where coal ash and water accumulated, additional water infiltrated the waste, and contaminants leached into ground and surface waters. *See id*. at 21,325.

At numerous sites, toxins in coal ash have leaked from unlined landfills and impoundments into surface waters—such as rivers, streams, and seas—and groundwater that may be used as drinking water. *Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals From Electric Utilities*, 75 Fed. Reg. 35,128, 35,131, 35,204, 35,234–39 (June 21, 2010). The chemicals in coal ash increase cancer risk and can cause other harms including neurological, cardiovascular, and gastrointestinal problems. 80 Fed. Reg. at 21,450. Selenium in coal ash has poisoned dozens of aquatic environments and killed or impaired fish, amphibians,

5

and the wildlife that feed on them. *Id.* Decades of exposure to the harms of unsafe coal ash disposal have jeopardized—and continue to jeopardize—the health, property, and safety of Sierra Club's members, who live, work, and recreate near the Gavin Plant and other coal ash disposal sites. *See* JA___ (Sierra Club, Mot. to Intervene, Declarations of Neil Waggoner and Marianne Barte, Doc. 1990721 (Mar. 17, 2023)).

**B.     PREVENTING AND CLEANING UP GROUNDWATER CONTAMINATION ARE PRIMARY GOALS OF RCRA AND THE CCR RULE.**

**1.  RCRA requires EPA to protect human health and the environment from the harms of improper solid waste disposal, including groundwater contamination.**

Congress passed RCRA in 1976 to establish a comprehensive federal program to regulate the handling and disposal of solid waste. *See* 42 U.S.C. § 6901. Congress tasked EPA with implementing RCRA, including through "the promulgation of guidelines for solid waste collection, transport, separation, recovery, and disposal practices and systems." *Id.* § 6902(a)(8). RCRA requires that EPA prohibit "open dumping" on the land, close existing dumps, and provide for the management and disposal of hazardous waste in a manner that protects human health and the environment. *Id.* § 6902(a)(3), (4). In its findings, Congress made clear that this includes addressing the contamination of groundwater by solid waste. Congress found that "open dumping is particularly harmful to health,

6

contaminates drinking water from *underground* and surface supplies, and pollutes the air and the land." *Id.* § 6901(b)(4) (emphasis added).

EPA regulates the disposal of most solid wastes not classified as hazardous under subtitle D of RCRA. In subtitle D, Congress directed EPA to promulgate regulations defining when a solid waste disposal facility is a "sanitary landfill" as opposed to a prohibited "open dump." *Id*. § 6944(a). Section 4004(a) of RCRA provides a protectiveness standard that EPA's subtitle D regulatory criteria must meet. Namely, EPA can classify units as sanitary landfills "only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste . . . ." *Id.*

## 2. The CCR Rule establishes clear standards to protect groundwater from coal ash contamination.

On April 17, 2015, nearly forty years after RCRA's passage, EPA promulgated its first rule to regulate the disposal and handling of coal ash. 80 Fed. Reg. at 21,302. In adopting the CCR Rule, which went into effect on October 14, 2015, EPA noted that coal ash contains numerous toxic and hazardous contaminants associated with serious health and environmental harms. *Id.* at 21,311.

The Rule makes clear that protection of groundwater quality is paramount. Throughout the Rule's preamble, EPA discussed preventing contamination of

groundwater given "[r]isks to human health result[ing] from ingestion of groundwater." *Id.* at 21,450. Among other things, EPA emphasized that "where the groundwater elevation is high enough to intersect the base of the waste management unit . . . this hydraulic connection can enhance the transport of contaminants of concern from the CCR unit into groundwater." *Id.* at 21,362. EPA described a situation where "[r]ainwater infiltration into exposed CCR coupled with groundwater-CCR interactions and the transmissivity characteristics of local strata contributed to rapid migration of heavy metals, including antimony, arsenic, cadmium, nickel, and thallium to residential drinking water wells . . . and significant deterioration of water quality as a result of placement of CCR." *Id.* From this and other evidence, EPA concluded that "[p]lacement of CCR into un-engineered, unlined units in permeable strata has plainly led to adverse impacts to groundwater." *Id.*

### 3. The CCR Rule includes clear standards to protect groundwater during and after CCR unit closure.

The CCR Rule defines a CCR unit as "any CCR landfill, CCR surface impoundment, or lateral expansion of a CCR unit, or a combination of more than one of these units," whether new or existing. 40 C.F.R. § 257.53. CCR Rule provisions related to the "closure . . . of CCR units" include critical protections to prevent groundwater contamination. *Id.* § 257.102. Where a site operator intends to

8

close a unit with CCR in place, the CCR Rule imposes general performance standards that apply to the entire "CCR unit." *Id.* § 257.102(d)(1), (2). The Rule also includes standards that apply specifically to any "final cover system" used when closing a CCR unit. *Id.* § 257.102(d)(3). The CCR Rule is clear that RCRA compels compliance with both the general performance standards and specific cover requirements: "Facilities failing to satisfy *any* of the criteria in . . . §§ 257.50 through 257.107 are considered open dumping, which are prohibited under section 4005 of [RCRA]." *Id.* § 257.1(a)(1) (emphasis added).

Prior to covering a CCR surface impoundment where waste is left in place, "[f]ree liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues." *Id.* § 257.102(d)(2)(i).[6] Similarly, the entire "unit" must be closed in a manner that will "[p]reclude the probability of future impoundment of water, sediment, or slurry." *Id.* § 257.102(d)(1)(ii). A CCR unit closed with coal ash in place must also "[c]ontrol, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters or to the atmosphere." *Id.* § 257.102(d)(1)(i).

---

[6] A CCR surface impoundment is defined as "a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR." 40 C.F.R. § 257.2.

9

The owner/operator also "must install a final cover system that is designed to minimize infiltration and erosion, and at a minimum, meets the requirements of paragraph (d)(3)(i) of this section." *Id.* § 257.102(d)(3). Distinct from the requirements described above, which apply to the entire CCR unit, paragraph (d)(3)(i)'s standards relate to the permeability and integrity of the final cover and minimization of erosion. *Id.* § 257.102(d)(3)(i).

### 4. The CCR Rule and subsequent Improvements Act establish several mechanisms to ensure compliance.

EPA designed the CCR Rule to be self-implementing—i.e., covered facilities were required to comply with the Rule's requirements but did not need to obtain a permit from EPA or a State. 80 Fed. Reg. at 21,332–35. Initially, the regulations were enforceable only through federal court litigation by States or private citizens. *See* 42 U.S.C. § 6972(a)(1)(A). Accordingly, and in order to "facilitate citizen and state oversight and overall enforcement of the requirements," the CCR Rule requires certification of compliance by a qualified professional engineer and includes technical and transparency, such as the publication of compliance documentation, to enable third party compliance assessment. 80 Fed. Reg. at 21,335.

10

In December 2016, Congress passed the Water Infrastructure Improvements for the Nation Act ("Improvements Act").[7] The Improvements Act amended RCRA by, among other things, authorizing EPA to approve state CCR permitting programs that are "at least as protective as" CCR Rule requirements and authorizing EPA to enforce the CCR Rule in States without approved programs. 42 U.S.C. § 6945(d)(1)(B)(ii), (d)(4).

### 5. In its 2018 *USWAG* decision, this Court vacated and remanded key provisions of the 2015 CCR Rule that failed to protect human health and the environment as required by RCRA.

Soon after publication of the CCR Rule in 2015, environmental organizations and industry groups brought legal challenges before this Court, which were consolidated. *USWAG*, 901 F.3d 414. The Court ruled on these petitions in 2018. Reviewing EPA's record underlying the Rule, the Court *inter alia* relied heavily on EPA's assessment of risks to human health and the environment when CCR contaminates groundwater. *Id.* at 422. This Court noted that "waste that escapes landfills and surface impoundments and then contaminates groundwater tapped as drinking water" was a main exposure pathway for dangerous coal ash constituents. *Id.* at 421. The Court also found that "[g]roundwater contamination is more likely to occur at sites that are unlined or

---

[7] Improvements Act, Pub. L. No. 114-322, 130 Stat. 1628 (2016) (codified at 42 U.S.C. § 6945(d)).

lack adequate lining between the coal ash and the soil beneath it" and that "many impoundments are lined only with compacted soil and are therefore far less protective" than impoundments with composite lining. *Id.* at 422. The Court emphasized EPA's conclusion that "putting Coal Residuals 'in unlined surface impoundments and landfills presents the greatest risks to human health and the environment,'" *id.* at 427 (quoting 80 Fed. Reg. at 21,451), and found that "hundreds of unlined impoundments are at significant risk of harmful leakage . . . [that] pose[s] substantial risks to humans and the environment." *Id.* at 428.

Based on its review of the record, including the risks to human health and the environment when coal ash contaminates groundwater, this Court determined that "EPA acted arbitrarily and capriciously" and in violation of RCRA when it did not require closure of unlined surface impoundments. The Court also found that EPA acted arbitrarily and capriciously when it treated clay-lined impoundments as "lined" and exempted inactive surface impoundments at inactive power plants from Rule coverage. *Id.* at 449. The Court vacated corresponding regulatory provisions and remanded the Rule back to EPA. *Id.*

### 6. The 2020 Part A rulemaking created the extension process at issue in the present matter.

On August 28, 2020, EPA amended the CCR Rule to require that all unlined surface impoundments initiate closure by April 11, 2021. *Hazardous and Solid*

*Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; A Holistic Approach to Closure Part A: Deadline To Initiate Closure*, 85 Fed. Reg. 53,516, 53,517 (Aug. 28, 2020) ("Part A regulations"). The Part A regulations also created a process through which owners and operators of certain CCR units could seek to extend their closure deadlines. Owners and operators could apply for and receive an extension of the CCR unit closure deadline if they demonstrated that "[n]o alternative disposal capacity is available on or off-site" for CCR that would otherwise go to the closing unit, 40 C.F.R. § 257.103(a)(1)(i), and that the owner or operator is "in compliance with all other requirements" of the CCR Rule at the facility for which an extension is sought. *Id.* § 257.103(a)(1)(iii). The Part A regulations provided a deadline for extension requests and stated that EPA "will publish its proposed decision" on each such request, make it available for public comment, and issue a final decision "[a]fter consideration of the comments." *Id.* § 257.103(f)(3)(iii)–(iv). Given the CCR Rule's self-implementing nature, EPA's review of Part A applications was the first time that EPA evaluated facilities' Rule compliance.

### C.   GAVIN POWER SUBMITTED AN APPLICATION SEEKING TO EXTEND THE CLOSURE INITIATION DEADLINE FOR ITS BOTTOM ASH POND.

Gavin Power owns and operates the Gavin Plant, a coal-fired power plant that generates and disposes of CCR on-site. JA__ (Gavin Order at 9). On

13

November 30, 2020, Gavin Power submitted a Part A application requesting to extend the deadline for closing its Bottom Ash Pond, an unlined surface impoundment, from April 11, 2021 to May 4, 2023. JA__ (*Id.* at 10). There are two other CCR units at the Gavin Plant: the Stingy Run Fly Ash Pond, a 300-acre unlined surface impoundment that Gavin Power closed in 2021 with waste in place, and a CCR landfill receiving primarily flue gas desulfurization materials. JA__ (*Id.* at 11).

On January 11, 2022, EPA issued a proposed order denying Gavin Power's request for a deadline extension. JA__ (Proposed Gavin Order). Per the Part A regulations, EPA provided a public comment period. JA__ (*Id.* at 1). Petitioners, Sierra Club, and other entities submitted comments on the Proposed Gavin Order that EPA reviewed prior to its issuance of a final decision.[8]

---

[8] JA__ (Earthjustice et al., Comments on Proposed Denials of Alternative Closure Deadlines, Docket ID No. EPA-HQ-OLEM-2021-0590-0078 (Mar. 25, 2022)); JA__ (Comments of Gavin Power, LLC on EPA's Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant, Docket ID. No. EPA-HQ-OLEM-2021-0590-0076 (Mar. 25, 2022)); JA__ (Util. Solid Waste Activities Grp., Comments on Proposed Decision, Docket ID No. EPA-HQ-OLEM-2021-0590-0054 (Mar. 25, 2022)); JA__ (Util. Solid Waste Activities Grp., Request for Extension of Comment Period on Proposed Decision, Docket ID No. EPA-HQ-OLEM-2021-0590-0045 (Feb. 10, 2022)); JA__ (Comments of Luminant Generation Company LLC et al., Docket ID No. EPA-HQ-OLEM-2021-0590-0057 (Mar. 25, 2022)).

### D.    EPA ISSUED A FINAL ORDER DENYING GAVIN POWER'S PART A APPLICATION.

EPA issued a final order denying the Gavin Plant's Part A application on November 18, 2022. JA__ (Gavin Order). EPA found that Gavin Power failed to make several showings required to support a Part A closure deadline extension. First, EPA found that Gavin Power did not demonstrate that no alternative disposal capacity was available at the time of application and relatedly did not demonstrate that it was technically infeasible to obtain alternative disposal capacity by April 11, 2021. JA__ (*Id.* at 7).

Second, EPA found that Gavin Power failed to demonstrate that its facility was in full compliance with the CCR Rule, a prerequisite for obtaining a closure extension.[9] Specifically, Gavin Power failed to demonstrate compliance with: 1) closure performance standards that apply to closure of the Fly Ash Reservoir; 2) closure plan requirements that apply to closure of the Fly Ash Reservoir; 3) groundwater monitoring system requirements for the Bottom Ash Pond; and 4) groundwater monitoring system requirements for the Fly Ash Reservoir and CCR landfill. JA__ (*Id.* at 12–13).

Of particular relevance here, EPA found that the Fly Ash Reservoir was closed "in contact with groundwater at levels high enough to saturate the CCR in

---

[9] 40 C.F.R. § 257.103(f)(1)(iii).

the unit," JA__ (*Id.* at 14), and that groundwater in the unit could be as deep as sixty-four feet. JA__ (*Id.* at 15). EPA also determined that Gavin Power had undertaken no engineering measures that would address the contact between coal ash and groundwater. JA__ (*Id.* at 14). EPA noted that "[n]o commenter disputed any of the facts presented or provided evidence to demonstrate that EPA was mistaken." JA__ (*Id.* at 14). Based on its undisputed findings, EPA concluded "that the waste in the unit will continue to be saturated by the groundwater that flows "into and out of the unlined impoundment, essentially allowing contaminants to leak out of the closed unit indefinitely." JA__ (*Id.* at 15).

## SUMMARY OF ARGUMENT

Petitioners seek permission to walk away from millions of tons of coal ash at the Gavin Plant—and other sites throughout the country—leaving their ash to contaminate groundwater, surface water, and drinking water in perpetuity. EPA issued the challenged action here consistent with its duties under RCRA, as recognized by this Court in its *USWAG* decision, to protect human health and the environment from harms from unsafe waste disposal. Petitioners' claims to the contrary are based upon their misconstruction of the CCR Rule, including the role of the qualified professional engineers they hire, and their improper assertion that they have a reliance interest in this misconstruction. Petitioners' arguments are unsupported and should be denied.

Petitioners claim that EPA engaged in improper rulemaking when it made determinations specific to the Gavin Plant, including that its Fly Ash Reservoir was improperly closed with waste saturated in groundwater and no controls to prevent ongoing groundwater contamination. This claim is contradicted by the plain language of the Rule; inconsistent with the objectives of RCRA, as recognized by this Court; and contrary to decades of EPA guidance—all of which make clear that preventing groundwater from being contaminated by waste is essential to EPA's RCRA mandate and its regulation of CCR.

Petitioners' claims depend upon an incomplete and misleading presentation of the CCR Rule. Petitioners focus heavily on the CCR Rule's standards for "final cover systems" that prevent water from entering from above when CCR units are closed with waste in place. Petitioners largely ignore parallel general performance standards that, by their plain language, apply to entire CCR units and prohibit groundwater from remaining in, entering, or leaving, a closed unit. These general standards require, among other things: the elimination of "free liquids" from CCR units prior to closure; preclusion of the probability of future impoundment of water and coal ash slurry; and closure in a manner that controls, minimizes, or eliminates "to the maximum extent feasible" the infiltration of liquids into the unit and the release of contaminants out of the unit after closure. 40 C.F.R. § 257.102(d)(1)(i), (2)(i). When Petitioners do acknowledge these general performance standards, they

17

conjecture—without any basis in the text of the rule—that these standards apply only to the final cover and not the CCR unit as a whole.

Petitioners also claim that they are entitled to relief because EPA failed to consider their purported reliance interest in their own misconstruction of the CCR Rule when the agency issued the Gavin Order. JA__ (Pet. Br. § IV.B.). Petitioners assert that they were denied fair notice of EPA's purported change in position. JA__ (*Id.*). These arguments are without merit. EPA faithfully applied the plain language of the CCR Rule to specific circumstances at the Gavin Plant and made no change in its standards for the closure of CCR units with waste in place. Petitioners have no cognizable reliance interest in their own erroneous reading of the law.

Finally, Petitioners assert that EPA's site-specific findings in the Gavin Order are unlawful. Although Petitioners do not challenge the underlying substantive validity of EPA's findings, they point to the CCR Rule's requirement that a qualified professional engineer certify compliance with certain provisions and claim that EPA may not "second-guess[]" those certifications. JA__ (*Id.* at 55). This argument is unsupported by the plain language of the regulations. Moreover, accepting this argument would require EPA to abdicate its duties under RCRA to implement and enforce its regulations and undermine enforcement by States and citizens, a key compliance feature of the Rule.

## STANDARD OF REVIEW

EPA's decision must be upheld unless this Court determines that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Where a court is called upon to evaluate the meaning of an unambiguous regulation, "the court must give it effect, as the court would any law." *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019). Assessing whether there is unambiguous meaning requires the court to "consider the text, structure, history, and purpose of a regulation." *Id.* at 2404. If there is "genuine ambiguity," courts are to defer to agency interpretations where they are "reasonable." *Id.* at 2415.

19

## ARGUMENT

I.  **THE GAVIN ORDER IS CONSISTENT WITH THE PLAIN LANGUAGE OF THE CCR RULE AND PROMULGATES NO NEW REGULATION.**

Petitioners in the related Case No. 22-1056, many of whom are also Petitioners in the present matter, challenge ten non-final EPA actions as "a series of interrelated documents that purport to revise key provisions of EPA's existing rules." JA__ (Case No. 22-1056, Joint Opening Brief of Petitioners, at ii, Doc. 1976606 (Dec. 6, 2022)). Petitioners in the present matter claim that EPA has applied this alleged new "2022 Rule" to the Gavin Plant by creating a "new categorical prohibition" against closing a CCR unit with waste in place and ash in contact with groundwater, JA__ (Pet. Br. at 20–21); and by employing new definitions for the terms "free liquids," "infiltration," and "impound" found in the CCR Rule, JA__ (*id*. at 22).

As the text of the Gavin Order makes clear, EPA simply applied the plain language of CCR Rule requirements. The order creates no new regulations and does not constitute an illegal rule. Moreover, the order is consistent with decades of EPA guidance on waste disposal and pond closure. Despite Petitioners' attempts to paint the Gavin Order as illegal agency action, their actual quarrel is with the CCR Rule itself, which is beyond judicial review.

20

**A.    The CCR Rule establishes clear and distinct closure standards for an entire CCR unit and for a final cover.**

The CCR Rule provides two avenues for closing a CCR unit: "leaving the CCR in place and installing a final cover" and "removal of the CCR and decontamination of the CCR unit." 40 C.F.R. § 257.102(a). Petitioners claim that EPA has modified the requirements for when CCR is left in place by requiring regulated entities to address the interaction of CCR and groundwater. *see, e.g.*, JA__ (Pet. Br. at 14). This claim rests on a fundamental misreading of the Rule. The Rule imposes clear standards on operators who close a CCR unit with waste in place, including requirements that explicitly apply to entire CCR units. Petitioners either ignore these requirements or mischaracterize them as applying only to final covers. Petitioners then rely on this mischaracterization to claim that the Rule does not establish groundwater requirements for units closed in place and covered.

Despite Petitioners' attempts to rewrite a nine-year-old rule, the CCR Rule's closure performance standards apply to entire CCR units closed with waste in place. Those standards include two requirements related to drainage and stabilization of a CCR unit, both of which must be met "prior to installing the final cover." 40 C.F.R. § 257.102(d)(2). The first requirement is that "free liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues." *Id.* § 257.102(d)(2)(i). The Rule defines free liquids as those "which readily separate from the solid portion of a waste under ambient

21

temperature and pressure"—groundwater that flows through waste does exactly this. *Id.* § 260.10. The second requirement is that after drainage and solidification, "remaining wastes must be stabilized sufficient to support the final cover system." *Id.* § 257.102(d)(2)(ii).

In an effort to escape the plain meaning of the Rule, Petitioners argue that groundwater is not covered by the "free liquid" definition because the definition does not explicitly reference groundwater. Petitioners also assert that the "free liquids" definition excludes groundwater because groundwater "is a *separate* defined term." JA__ (Pet. Br. at 43 (emphasis in original)). The Rule defines groundwater expansively as any "water below the land surface in a zone of saturation." 40 C.F.R. § 257.53. Where such water readily separates from the solid portion of CCR waste under ambient temperature and pressure, it meets the definition of "free liquid" and must be eliminated from a closing CCR unit before a final cover is installed. *Id.* § 257.102(d)(2)(i).[10]

If Petitioners' flawed reasoning were accepted, no liquids would be covered by the free liquids definition, as the definition also does not mention rainwater,

---

[10] "Ambient" is undefined in the Rule and takes on its plain-language meaning of "existing or present on all sides." *Ambient*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ambient (last accessed Dec. 5, 2023). As used in the Rule, it refers to water that readily separates from the solid portion of CCR waste at the temperature and level of pressure in which it is found.

sluiced water, surface water, or any other type of liquid that might be found in a CCR unit. Such an absurd interpretation clearly does not comport with RCRA, nor is it consistent with the groundwater protection aims of the CCR Rule. Rather than list all potential sources of liquids, the Rule simply says "liquids" without qualification. Water, regardless of its source, is a "liquid."

Petitioners also attempt to rewrite the regulatory requirements concerning free liquids by stitching together language from two separate requirements to make them appear as one requirement, that free liquids be eliminated only to the degree necessary to support a final cover: "'[f]ree liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues' 'sufficient to support the final cover system.' 40 C.F.R § 257.102(d)(2)." JA__ (Pet. Br. at 11). This is highly misleading and inaccurate. The Rule clearly establishes two distinct requirements, elimination of free liquids (40 C.F.R § 257.102(d)(2)(i)) and, separately, stabilization of "[r]emaining wastes" sufficient to support the final cover system. *Id.* § 257.102(d)(2)(ii). The Rule specifies that the "owner or operator of a CCR surface impoundment . . . must meet" both. *Id.* § 257.102(d)(2).

The Rule also requires the owner or operator of a CCR unit to "ensure that, at a minimum, the CCR unit is closed in a manner that will: . . . preclude the probability of future impoundment of *water*, sediment, or slurry." *Id.*

23

§ 257.102(d)(1) (emphasis added). In addition, the owner or operator of a CCR unit:

> must ensure that, at a minimum, the CCR unit is closed in a manner that will: (i) control, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters or to the atmosphere."

*Id.* § 257.102(d)(1)(i). This requires owners and operators to address the infiltration of liquids into waste after closure, without distinction regarding the direction from which infiltration occurs, *and* address the release of contamination from the CCR unit after closure. In other words, it addresses the harms that result from groundwater entering *and* exiting CCR units, as occurs when CCR is in direct contact with groundwater. The express language of the Rule applies the requirements to an entire "CCR unit," not just the final cover, and states that the requirements may be met through measures that "control" infiltration and releases.

The CCR Rule includes additional performance standards that apply specifically to final covers. These are found in a separate subsection titled "final cover system," *id.* § 257.102(d)(3). The final cover section specifies permeability limits and states that the final cover must "use [] an infiltration layer that contains a minimum of 18 inches of earthen material." *Id.* § 257.102(d)(3)(i)(B). As noted above, this final cover may only be installed *after* free liquids have been eliminated from the CCR unit. The requirements for the final cover exist in parallel to the

closure requirements for the entire CCR unit. Petitioners ignore this structure of the CCR Rule because it undermines their assertion that longstanding Rule requirements addressing groundwater are actually new requirements.

At least one major industry actor has acknowledged that the CCR Rule, as written, requires owners and operators to address coal ash in contact with groundwater. Duke Energy, a recipient of one of the site-specific letters at issue in the related case,[11] testified under oath before the Public Service Commission of South Carolina that the CCR Rule's "'closure performance standards prohibit closure-in-place where groundwater is in actual or likely contact with the CCR unless effective engineering measures can be installed to control, minimize, or eliminate such conditions.'" JA__ (Gavin Order at 88 (citation omitted)).

### 1.    EPA does not require only excavation to achieve compliance with the Rule's performance standards when groundwater is present.

Petitioners claim that EPA has adopted the position that CCR units with ash in contact with groundwater "may only utilize the closure-by-removal option," and that this is a new standard that goes beyond the text of the Rules. JA__ (Pet. Br. at 14). But that is not what EPA did. EPA concluded that Gavin had failed to show it had taken any measures that would allow it to leave coal ash in contact with

---

[11] *See* JA__ (Case No. 22-1056, Pet. for Review, Attach. C, Doc. 1942595 (Apr. 8, 2022)).

groundwater *consistent with the standards* of 40 C.F.R. § 257.102(d)(1) and (2). Upon concluding that CCR in the Fly Ash Reservoir was left in contact with groundwater, EPA noted that no commenters disputed this conclusion *and* no commenters asserted that the CCR Rule's performance standards had otherwise been met, "for example, by documenting that engineering measures had been taken to address the continued contact between the groundwater and the CCR in the closed impoundment." JA__ (Gavin Order at 14). Elsewhere in the Order, EPA similarly notes that Gavin Power's closure plan "fails to describe any engineering measures taken to 'control, minimize or eliminate'" post-closure infiltration of liquids or post-closure releases of CCR contaminants to the maximum extent feasible, as required by the CCR Rule. JA__ (*Id.* at 15 (citing 40 C.F.R. § 257.102(d)(1)(i))).

### 2.    The CCR Rule's groundwater protections are consistent with decades of EPA guidance.

The CCR Rule's requirements are consistent with decades of EPA guidance addressing harms that can result when groundwater is in contact with waste. When adopting standards for the treatment, storage, and disposal of hazardous waste in 1982, EPA stated:

> Ground-water protection has been one of EPA's central concerns in devising a regulatory strategy for hazardous waste land disposal. A large number of the documented damage cases from hazardous waste land disposal have involved ground-water contamination.

26

Hazardous Waste Management System; Standards Applicable to Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities; and EPA Administered Permit Programs, 47 Fed. Reg. 32,274, 32,283 (July 26, 1982). In 1989, EPA issued technical guidance for hazardous waste landfills and surface impoundments stating that "The Agency considers keeping water out of the unit to be the prime element of the [closure requirements' liquids management] strategy." JA__ (EPA, Technical Guidance Document: Final Covers on Hazardous Waste Landfills and Surface Impoundments, EPA/530-SW-89-047, at 5 (July 1989)). The guidance further states that "a properly designed and maintained cover" can be effective in keeping water out of the unit only "[w]here the waste mass lies entirely above the zone of ground-water saturation." JA__ (*Id.*).

A 1991 EPA Technical Resource Document also expresses concern with waste contacting groundwater: "In-place closure of surface impoundments near environmentally sensitive areas (e.g., wetlands, fault zones, flood-prone areas, areas with shallow ground water, or areas with highly permeable subsoils) may pose a significant environmental risk." JA__ (EPA, Technical Resource Document: Design, Construction, and Operation of Hazardous and Non-Hazardous Waste Surface Impoundments, EPA/530/SW-91/054, at PDF p. 152 (June 1991)).

Similarly, EPA guidance from 1985 stated:

27

> We must be clear that ground-water quality is an integral aspect of RCRA closure. Owners and operators must not be allowed to 'walk away' from units with inadequate monitoring systems and ground-water contamination at closure.

JA__ (Mem. From Office of Solid Waste and Emergency Response on Groundwater Quality at Closure, RPPC No. 9476.1985(02), RCRA Online No. 12444 (Aug. 27, 1985)). EPA's plain language definition of infiltration as including groundwater is consistent with 2003 guidance that defines "infiltration" as "the entry of precipitation, ground water, waste, or other liquid into a soil layer or other stratum." JA___ (EPA, Guide for Industrial Waste Management, at G-9 (Mar. 2016)).

Guidance found in a 1988 exchange between EPA Region 5 and Headquarters further demonstrates EPA's focus on preventing contact between waste and groundwater. EPA Region 5 consulted Headquarters regarding a plan to close two hazardous waste ponds with waste in place where the waste might be in contact with groundwater. EPA made clear that the closure performance standards were to be used where needed to "minimize or eliminate post-closure escape of hazardous constituents," including in the present matter where "hazardous constituents may migrate into ground water." JA__ (EPA, Regulatory Interpretation of the Closure Performance Standard, OSWER Directive No. 9476.00-13, at 1–2 (Feb. 8, 1988)). Headquarters stated this was in addition to

28

cover-related requirements, which would not address "the problem identified in this case," i.e. the problem of waste in contact with groundwater. JA__ (*Id.* at 2).

The plain language of the CCR Rule, numerous guidance documents issued by EPA over the last several decades, and a basic understanding of hydrogeology underscore the fact that preventing rainfall from reaching coal ash in a closed CCR unit cannot alone protect against groundwater contamination. Petitioners' claim that the Gavin Order articulates requirements that are new and disruptive is flat wrong.

### B. Petitioners' rewriting of the CCR Rule would be unreasonable and violate RCRA.

Claiming that EPA has "announced" new definitions of "infiltration" and "free liquids," JA__ (Pet. Br. at 22), Petitioners would have this Court read into the CCR Rule a distinction—between rainwater and groundwater—where none exists. Not one word in the Rule supports this distinction. Indeed, "infiltration" is not defined by RCRA or the 2015 Rule and thus, as explained by EPA, takes its ordinary meaning. JA__ (Resp. Br. at 33).

Petitioners' proposed interpretation is contrary to the Rule's plain language and unreasonable given voluminous evidence of harm associated with groundwater contamination presented by EPA when it promulgated the CCR Rule. *See, e.g.,* JA__ (EPA, *Human and Ecological Risk Assessment of Coal Combustion*

29

*Residuals, Final*, at ES-7 (Dec. 2014) ("Based on the analyses presented in this document, EPA concludes that current management practice of placing CCR waste in surface impoundments and landfills poses risks to human health and the environment within the range that OSWER typically regulates.")). Moreover, in its *USWAG* decision, this Court found that EPA acted arbitrarily and capriciously and in violation of RCRA when it promulgated regulations allowing unlined surface impoundments to remain open until they caused exceedances of groundwater protection standards. The Court noted that "putting Coal Residuals 'in unlined surface impoundments and landfills presents the greatest risks to human health and the environment,'" *USWAG*, 901 F.3d at 427 (citing 80 Fed. Reg. at 21,451), and that hundreds of unlined impoundments "are at significant risk of harmful leakage" and "pose substantial risks to humans and the environment." *Id.* at 428. Petitioners now ask this Court to do exactly what has already been found to pose a substantial risk to human health and the environment and violate RCRA's protectiveness standard: to allow coal ash to sit in unlined impoundments and thereby risk contaminating groundwater in perpetuity. *See id.* at 427–31 (applying 42 U.S.C. § 6944(a)).

**C.    The Gavin Order does not constitute legislative rulemaking.**

Petitioners make the erroneous claim that the Gavin Order meets this Court's criteria for a legislative rule. In *American Mining Congress*, this Court articulated

four questions for determining whether an agency statement has "legal effect" and

thus constitutes a legislative rule:

> (1) whether in the absence of the rule there would not be an adequate
> legislative basis for enforcement action or other agency action to confer
> benefits or ensure the performance of duties, (2) whether the agency has
> published the rule in the Code of Federal Regulations, (3) whether the
> agency has explicitly invoked its general legislative authority, or (4)
> whether the rule effectively amends a prior legislative rule.

*Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C.

Cir. 1993). If any of these four questions is answered affirmatively, the agency

statement is a legislative rule. *Id.* None can be here.

With respect to the first criterion, EPA's denial of Gavin Power's Part A

application and imposition of a closure deadline requirement are based entirely on

application of existing CCR Rule regulatory provisions. Petitioners claim that this

criterion is met because EPA references its analysis in the Gavin Order in its

subsequent proposal to deny Alabama's application to run its own state CCR

program. JA__ (Pet. Br. at 40–41). It is entirely proper, of course, for an agency to

refer to its past discussions of a regulation in subsequent matters. While Petitioners

falsely claim that EPA cites the Gavin Order "as the legislative basis for other

agency actions," JA__ (*Id.* at 40), a review of the proposed Alabama decision

makes clear that EPA is basing its proposed decision on the Rule's language and

referencing the Gavin Order as an instance where "EPA has previously explained"

31

the Rule's clear meaning. *Alabama: Denial of State Coal Combustion Residuals Permit Program*, 88 Fed. Reg. 55,220, 55,236 (Aug. 14, 2023).

Petitioners concede that the second criterion has not been met, as the Gavin Order was not published in the Code of Federal Regulations. The third criterion, which looks at whether EPA explicitly invokes its "general legislative authority" under RCRA, *Am. Mining Congress*, 995 F.2d at 1112, likewise is not met here. EPA makes no such invocation of its general legislative authority, grounding its decision in the language of the Rule itself. EPA notes that its plain language application of the Rule is consistent with the agency's duties under RCRA, as recognized by this Court in *USWAG*, JA__(Gavin Order at 36–38), but simply referring to the underlying statutory framework in which a regulatory action takes place is a far cry from invoking the "general legislative authority" provided to EPA by RCRA to give the Gavin Order legal effect. JA__ (Pet. Br. at 41–42); *see also Am. Mining Congress*, 995 F.2d at 1112.

Finally, the Gavin Order does not effectively amend a prior legislative rule, and thus the fourth criterion of *American Mining Congress* is not met. As discussed above, the Gavin Order is entirely consistent with the plain language of the CCR Rule and decades of EPA guidance related to EPA's obligation under RCRA to protect groundwater from contamination due to improper waste disposal. EPA proposes to define certain terms in its current rulemaking only because

32

certain industry actors, including Petitioners, persist in denying their plain meaning.

## II. EPA ACTED REASONABLY AND LAWFULLY WHEN IT DETERMINED THAT GAVIN POWER HAD FAILED TO DEMONSTRATE COMPLIANCE WITH THE CCR RULE.

As noted above, EPA included several provisions in the CCR Rule intended to increase the likelihood of industry compliance given the risks that come with a self-implementing rule. *See supra,* Statement of the Case. One such provision is the requirement that facility owners retain a qualified professional engineer to certify that their CCR units are in compliance with certain Rule requirements, including some pertaining to closure of impoundments with waste in place.[12] Seizing upon this one feature, while ignoring other compliance demonstration mandates, RCRA's citizen suit provision, and the plain language of the Part A regulations, Petitioners leap to the conclusion that these certifications conclusively "establish compliance with the requirements" of the Rule. JA__ (Pet. Br. at 55). This conclusion is unsupported by the regulatory text and in direct conflict with EPA explanations of the CCR Rule at the time of promulgation.

---

[12] For example, a qualified professional engineer must certify that a unit's closure plan and final cover design meet Rule requirements, 40 C.F.R. § 257.102(b)(4), (d)(3)(iii).

As EPA explains in its brief, the Part A regulations require applicants to "demonstrate," not merely certify, that they are in compliance with the CCR Rule in order to obtain a closure deadline extension. JA__ (Resp. Br. at 53 (citing 40 C.F.R. § 257.103(f)(1)(viii))). The rule also requires EPA to "evaluate the demonstration" and permits EPA to "request additional information to complete its review" before issuing its decision. 40 C.F.R. § 257.103(f)(3)(ii). None of these provisions would make sense if certification by a facility owner's qualified professional engineer were the conclusive determinant of compliance.

EPA's explanation of the role of qualified professional engineers in the preamble of the 2015 CCR Rule further contradicts Petitioners' argument. According to EPA, "[t]he certifications required by the rule . . . are important, [but] they are not the sole mechanism ensuring regulatory compliance." 80 Fed. Reg. at 21,335. EPA noted that it developed "a number of provisions designed to facilitate citizens to enforce the rule, . . . [c]hief among these is the requirement to publicly post monitoring data, along with critical documentation of facility operations." *Id.* In fact, EPA explicitly rejected a suggestion offered by commenters at the time that the Rule be written in the manner that Petitioners now claim it is:

> None of the alternatives offered by the commenters would fulfill these same objectives. For example, simply making the certification of the qualified professional engineer available on the Web site without the

34

> underlying support information fails to provide the same incentives [to comply with the rule] because no one could evaluate the accuracy of that certification.

*Id.* at 21,339. Instead, EPA included multiple requirements in the rule beyond

certification, including:

> recordkeeping and notification requirements [to] minimize the danger of owners or operators abusing the self-implementing system being established in this rule through increased transparency and by facilitating the citizen suit enforcement provisions applicable to the rule.

*Id.* at 21,427.

## III.    PETITIONERS HAVE NO RELIANCE INTEREST IN THEIR INACCURATE CHARACTERIZATION OF THE CCR RULE.

Petitioners' claim that they have a cognizable interest in their interpretation

of the CCR Rule, an interpretation that conflicts with the Rule's plain language, is

baseless. Petitioners cannot rely on a mistaken view of the law to justify ignorance

of plain-language CCR Rule requirements. In the Gavin Order, EPA applied the

CCR Rule as it was written in 2015. Petitioners cannot claim that they relied on a

former position of EPA's with respect to closure of a CCR unit with coal ash in

contact with groundwater because no such former position exists.

### A.    Petitioners cannot rely on their own misinterpretation of existing requirements.

Petitioners' supposed reliance on a mistaken view of the law is no defense

for their lack of compliance. It is well established that "civil violations of RCRA

35

provisions are properly characterized as strict liability offenses" and, therefore, that any ignorance of RCRA or CCR Rule requirements is no excuse for a failure to comply with them. *United States v. Allegan Metal Finishing Co.*, 696 F.Supp. 275, 287 (W.D. Mich. 1988); *see also Cox v. City of Dallas*, 256 F.3d 281, 295–96 (5th Cir. 2001) (citing *United States v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 741 (8th Cir. 1986); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1383 (8th Cir. 1989); *Zands v. Nelson*, 797 F. Supp. 805, 809 (S.D. Cal. 1992) ("Individuals are liable under RCRA without regard to fault or negligence."); *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361, 1400–01 (D.N.H. 1985), *aff'd*, 900 F.2d 429 (1st Cir. 1990); *United States v. Production Plated Plastics, Inc.*, 742 F.Supp. 956, 960 (W.D. Mich. 1990), *aff'd*, 955 F.2d 45 (6th Cir. 1992) ("RCRA is a remedial strict liability statute which is construed liberally."). Further, it is a long-recognized "common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." *Jerman v. Carlisle*, 559 U.S. 573, 581(2010) (quoting *Barlow v. United States*, 7 Pet. 404, 411 (1833)); *see id.* at 582–83 ("Our law is therefore no stranger to the possibility that an act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law."); *see also Cheek v. United States*, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the

law or a mistake of the law is no defense . . . is deeply rooted in the American legal system."). Petitioners' reliance claim thus must be rejected.

## B. EPA's request for comment on whether it should define already clear terms reflects industry intransigence, not Rule ambiguity.

When regulatory terms are undefined, they are understood by their ordinary meaning. *See, e.g., Huashan Zhang v. United States Citizenship & Immigr. Servs.*, 344 F.Supp.3d 32, 48 (D.D.C. 2018), *aff'd*, 978 F.3d 1314 (D.C. Cir. 2020) (The "words of statutes or regulations must be given their 'ordinary, contemporary common meaning.'" (quoting *FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009))); *Bd. Of Educ. of Gallup-McKinley Cnty. Sch. v. Native Am. Disability Law Center, Inc.*, 959 F.3d 1011, 1013 (10th Cir. 2020) ("In interpreting regulations … we begin our analysis by examining the plain language of the text of the regulation, giving the words their ordinary meaning." (citations omitted)); *Glycine & More, Inc. v. United States,* 880 F.3d 1335, 1344 (Fed. Cir. 2018) ("When construing an agency regulation … [w]e examine the regulation's plain language to ascertain its plain meaning." (citations omitted)); *see also, Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("If uncertainty does not exist" in the language of a rule, "[t]he regulation then just means what it means.").

EPA's begrudging invitation, in its proposed Legacy CCR Surface Impoundments Rule issued in May 2023, for comment on whether to adopt a

regulatory definition of the terms "liquids" and "infiltration" does not indicate any ambiguity in those terms. In fact, EPA states that it "strongly disagrees" with industry's misconstruction of these terms and "considers that the plain text of the regulation already clearly communicates" Rule requirements. Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Legacy CCR Surface Impoundments, 88 Fed. Reg. 31,982, 32,026 (May 18, 2023).

Ignoring EPA's clear intent, Petitioners point to EPA's request as evidence that EPA has changed the Rule because "EPA concedes" that the Rule's definition of "free liquids" does not include groundwater and the Rule does not specify that infiltration includes the lateral flow of groundwater. JA__ (Pet. Br. at 42). As discussed above, however, the term "free liquids" does not exclude groundwater. And as EPA notes in its proposed rule, "[t]he regulation does not differentiate between the sources of the liquid in the impoundment (e.g., surface water infiltration, sluice water intentionally added, groundwater intrusion)," to account for the fact that a CCR impoundment may contain several types of liquids. 88 Fed. Reg. at 31,992–93.

Likewise, EPA's request for comment on whether it should define "infiltration" does not reflect doubt in that term's plain meaning. Although "infiltration" is undefined in the CCR Rule, as EPA notes, it "refers to the

migration or movement of liquid into or through a CCR unit from any direction, including the top, sides, and bottom of the unit," consistent with its plain meaning and dictionary definitions. *Id.* at 32,025. In situations where groundwater intersects an unlined CCR unit, "water may infiltrate the unit from the sides and/or bottom of the unit because the base of the unit is below the water table." *Id.*

Given the clear, plain language of the CCR Rule's closure provisions, codifying regulatory definitions of terms such as "liquids" and "infiltration" should be unnecessary. *Id.* However, ignoring that plain language and EPA's countless statements to the contrary, Petitioners essentially argue that the presence of groundwater in ash ponds is irrelevant to closure compliance, and that the CCR Rule's closure in place requirements are limited to draining the surface portion of the pond, constructing a final cover, and preventing surface water —but not groundwater—infiltration thereafter. In light of Petitioners' apparent preference to litigate the reality that groundwater is liquid, and that infiltration can occur in any plane—from above, below, or the side—instead of properly closing its leaking, unlined ponds, EPA's decision to seek comment on whether to codify its longstanding, plain meaning definitions of key terms reflects not ambiguity of those terms but rather the goal of avoiding unnecessary and costly future litigation and ensuring timely, proper closure. The strained arguments that Petitioners put forth—that "infiltration" only refers to the movement of water into a unit from the

surface through a cover system and that the regulations do not require facilities to

eliminate "free liquids" made up of groundwater—are the same strained arguments

that EPA seeks to put to rest by explicitly defining terms in the CCR Rule whose

meaning is already clear. *Id.*

Lastly, Petitioners argue that EPA attempts to justify new interpretations of

the CCR Rule because "it has only now 'become apparent that the practice of

disposing of CCR below the water table is more common than previously

understood.'" JA__ (Pet. Br. at 47 (citing 88 Fed. Reg. at 32,009, 32,011)). Again,

this is misleading. In the 2014 Risk Assessment, EPA acknowledged:

> [T]hat there were some additional management practices that
> may result in higher risk at individual sites, but that could not
> be quantitatively modeled with the data available at the time.
> One specific example provided was of CCR disposal below the
> water table.

88 Fed. Reg. at 32,009. EPA knew facilities were disposing of waste in

groundwater and determined such a practice presented risks high enough to

warrant regulation. As stated in the Risk Assessment, the placement of CCR in

contact with water "could lead to additional contamination beyond what was

modeled nationwide." *Id.* at 32,010. Those risks have been demonstrated to be

even greater than originally determined in 2015. *See*, *e.g.*, *id.* at n.18 (citing Env't

Integrity Project, "Coal's Poisonous Legacy: Groundwater Contaminated by Coal

Ash Across the U.S." (2019)). The full magnitude of contamination from the

40

disposal of CCR in contact with groundwater may "only now" be apparent, but EPA was well aware of the dangers of such a practice in 2015 and drafted the CCR Rule to account for, and address, those dangers. *See, e.g.,* 80 Fed. Reg. at 21,396 ("[G]roundwater contamination is one of the key environmental and human health risks EPA has identified with CCR landfills and CCR surface impoundments.").

## CONCLUSION

For the foregoing reasons, the Petitions should be dismissed.

Respectfully submitted:

/s/ Thomas Cmar
Thomas Cmar
Earthjustice
6608 Wooster Pike
Cincinnati, OH 45227
(312) 257-9338
tcmar@earthjustice.org

Gavin Kearney
Jennifer Cassel
Earthjustice
311 South Wacker Dr.,
Ste. 1400
Chicago, IL 60606
(215) 717-4520
gkearney@earthjustice.org
jcassel@earthjustice.org

Gilbert Zelaya
Earthjustice
48 Wall St., 15th Fl.
New York, NY 10005
(212) 845-7393
gzelaya@earthjustice.org

Lisa Evans
Earthjustice
21 Ocean Ave.
Marblehead, MA 01945
(781) 631-4119
levans@earthjustice.org

*Counsel for Sierra Club*

Dated: December 8, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this filing complies with the type-volume limitation of this Court's July 14, 2022 Order because this document contains 9,097 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared using Times New Roman 14-point, a proportionally spaced typeface in Microsoft Word 365.

*/s/ Thomas Cmar*
Thomas Cmar
Earthjustice
6608 Wooster Pike
Cincinnati, OH 45227
(312) 257-9338
tcmar@earthjustice.org

Date: December 8, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy on all registered users.

*/s/ Thomas Cmar*
Thomas Cmar

Date: December 8, 2023