**ORAL ARGUMENT SCHEDULED FOR MARCH 7, 2024**

No. 23-1035 (consolidated with Nos. 23-1036, 23-1037, 23-1038)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELECTRIC ENERGY, INC., *et al.*,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents.*

**On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency**

**FINAL JOINT REPLY BRIEF OF PETITIONERS**

Stacey L. VanBelleghem
Karl A. Karg
LATHAM & WATKINS LLP
555 11th Street NW,
Suite 1000
Washington, D.C. 20004
202-637-2200

*Counsel for Gavin
Power, LLC*

Helgi C. Walker
David Fotouhi
Matt Gregory
GIBSON, DUNN &
CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
202-955-8500

P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N.,
Ste. 1500
Birmingham, AL 35203
205-251-8100

*Counsel for Electric Energy, Inc., Luminant Generation
Company LLC, Coleto Creek Power, LLC, Miami Fort
Power Company LLC, Zimmer Power Company LLC,
Dynegy Midwest Generation, LLC, Illinois Power
Generating Company, Illinois Power Resources
Generating, LLC, and Kincaid Generation, L.L.C.*

*Additional counsel and parties listed on inside cover*

**Dated:  January 31, 2024**

Douglas Green
Margaret K. Fawal
VENABLE LLP
600 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 344-4483
dhgreen@venable.com
mkfawal@venable.com

*Counsel for Utility Solid Waste
Activities Group*

Joshua R. More
Ann H. MacDonald
ARENTFOX SCHIFF LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: (312) 258-5500
Fax: (312) 258-5600
joshua.more@afslaw.com
ann.macdonald@afslaw.com

*Counsel for Appalachian Power
Company, Indiana Michigan Power
Company, Kentucky Power Company,
Public Service Company of
Oklahoma, Southwestern Electric
Power Company, and Wheeling
Power Company*

Michael L. Raiff
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Ste. 2100
Dallas, TX 75201

Stephanie Zapata Moore
Executive Vice President & General
Counsel
Daniel J. Kelly
Senior Vice President & Deputy
General Counsel
David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, TX 75039

*Counsel for Electric Energy, Inc.,
Luminant Generation Company LLC,
Coleto Creek Power, LLC, Miami
Fort Power Company LLC, Zimmer
Power Company LLC, Dynegy
Midwest Generation, LLC, Illinois
Power Generating Company, Illinois
Power Resources Generating, LLC,
and Kincaid Generation, L.L.C.*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...........................................................................i

TABLE OF AUTHORITIES .................................................................. iii

GLOSSARY ...................................................................................... viii

SUMMARY OF THE ARGUMENT ........................................................1

ARGUMENT ........................................................................................4

I.    This Court Has Jurisdiction Over the Rule That EPA Reaffirmed in
      the Final Gavin Denial.................................................................4

      A.    The Court Has Jurisdiction to Review the Waste-Below-The-
            Water-Table Prohibition and Related New Definitions........................4

      B.    The Court Lacks Jurisdiction to Review EPA's Denial of Gavin's
            Extension Request. ..............................................................5

II.   The Final Gavin Denial Reaffirms a Legislative Rule. ...................................9

      A.    EPA Reaffirmed the 2022 Rule in the Final Gavin Denial.................10

      B.    The Waste-Below-The-Water-Table Prohibition Is a Legislative
            Rule..............................................................................12

            1.    The New Rule Conflicts With the Plain Meaning of the
                  2015 Rule. ..............................................................12

            2.    EPA Explicitly Relied on Its Legislative Authority. ...............17

            3.    EPA Is Using the Requirements in the Final Gavin
                  Denial as Positive Law................................................19

III.  EPA Cannot Excuse Its Failure to Follow Statutory Requirements for
      Promulgating New RCRA Rules by Claiming Harmless Error. ...................20

IV.   The Rule Is Arbitrary and Capricious and Unlawful. ...................................24

V.    This Court Lacks Jurisdiction to Review Gavin-Specific Findings But
      if the Court Disagrees It Should Hold That They Are Unlawful. .................26

CONCLUSION ......................................................................................... 28

CERTIFICATE OF COMPLIANCE ....................................................... 31

CERTIFICATE OF SERVICE ................................................................ 32

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014)............................................................20

*Am. Mining Congress v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993)........................................12, 13, 14, 17

*Am. Portland Cement All. v. EPA*,
  101 F.3d 772 (D.C. Cir. 1996)..........................................................6, 9

*Artis v. District of Columbia*,
  583 U.S. 71 (2018).................................................................................8

*Brock v. Cathedral Bluffs Shale Oil Co.*,
  796 F.2d 533 (D.C. Cir. 1986)............................................................22

*Cement Kiln Recycling Coal. v. EPA*,
  493 F.3d 207 (D.C. Cir. 2007)............................................................21

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012).............................................................................25

*Circus Circus Casinos, Inc. v. NLRB*,
  961 F.3d 469 (D.C. Cir. 2020)............................................................25

*CSX Transp., Inc.  v. Surface Transp. Bd.*,
  774 F.3d 25 (D.C. Cir. 2014)................................................................5

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016).............................................................................24

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).............................................................................25

*Gen. Elec. Co. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002)............................................................21

*Hazardous Waste Treatment Council v. EPA*,
  910 F.2d 974 (D.C. Cir. 1990)...........................................................9

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019)...................................................................17

*McLouth Steel Prods. Corp. v. Thomas*,
  838 F.2d 1317 (D.C. Cir. 1988)......................................................22

*Molycorp, Inc. v. EPA*,
  197 F.3d 543 (D.C. Cir. 1999)..........................................................9

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  417 F.3d 1272 (D.C. Cir. 2005).......................................................10

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  583 U.S. 109 (2018).........................................................................9

*NLRB v. Bell Aerospace Co.*,
  416 U.S. 267 (1974).......................................................................12

*NRDC v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020)....................................................20, 21

*Nuestar, Inc. v. FCC*,
  857 F.3d 886 (D.C. Cir. 2017)...................................................12, 17

*Poet Biorefining, LLC v. EPA*,
  970 F.3d 392 (D.C. Cir. 2020)...................................................21, 22

*Safari Club Int'l v. Zinke*,
  878 F.3d 316 (D.C. Cir. 2017)...................................................10, 11

*USWAG v. EPA*,
  901 F.3d 414 (D.C. Cir. 2018)........................................................16

*Window Covering Mfrs. Ass'n v. CPSC*,
  82 F.4th 1273 (D.C. Cir. 2023)..................................................21, 22

## Federal Statutes

5 U.S.C. §551(4) ..................................................................................................10

5 U.S.C. §703 ......................................................................................................27

42 U.S.C. §6907(a)(3) .........................................................................................12

42 U.S.C. §6928(a)(1) .........................................................................................27

42 U.S.C. §6944(a) ....................................................................................3, 12, 17

42 U.S.C. §6976(a)(1) ......................................................................................4, 6

42 U.S.C. §6976(a)(2) ..........................................................................................6

42 U.S.C. §7607(b)(1) ..........................................................................................9

## Federal Regulations

40 C.F.R. §257.53 .........................................................................................15, 16

40 C.F.R. §257.91(a)(2) .......................................................................................27

40 C.F.R. §257.91(f) ............................................................................................28

40 C.F.R. §257.93 ................................................................................................28

40 C.F.R. §257.93(f)(6) .......................................................................................28

40 C.F.R. §257.94(e)(2) .......................................................................................28

40 C.F.R. §257.98 .........................................................................................19, 26

40 C.F.R. §257.101(a)(1) ......................................................................................7

40 C.F.R. §257.102(a) .........................................................................................13

40 C.F.R. §257.102(b) .........................................................................................27

40 C.F.R. §257.102(b)(1)(iii)....................................................15

40 C.F.R. §257.102(b)(2)........................................................24

40 C.F.R. §257.102(b)(4)......................................................27, 28

40 C.F.R. §257.102(d)(3)(iii)...................................................28

40 C.F.R. §257.102(f)(3) ......................................................28

40 C.F.R. §257.103(f)(1)(iii)...................................................27

40 C.F.R. §257.103(f)(2)(iii)...................................................27

40 C.F.R. §257.103(f)(3)(ii) ....................................................7

40 C.F.R. §257.104(b)(3)......................................................19, 26

40 C.F.R. §257.104(c).........................................................19, 26

40 C.F.R. §257.105 ............................................................28

40 C.F.R. §257.106 ............................................................28

40 C.F.R. §257.107 ............................................................28

**Federal Register**

80 Fed. Reg. 21,302 (Apr. 17, 2015) .......................................13, 15, 19, 27

83 Fed. Reg. 36,435 (July 30, 2018)..........................................28

84 Fed. Reg. 65,941 (Dec. 2, 2019)..........................................7, 8

85 Fed. Reg. 53,516 (Aug. 28, 2020)........................................7, 28

88 Fed. Reg. 31,982 (May 18, 2023) ..........................................18

88 Fed. Reg. 55,220 (Aug. 14, 2023)..........................................20

## **Miscellaneous**

Comments of the Luminant Companies, EPA-HQ-OLEM-2020-0107-0341 (July 17, 2023) ....................................................................................24

EPA Br., *USWAG v. EPA*, 901 F.3d 414 (D.C. Cir. 2018) (No. 15-1219)..............18

EPA, *Comment Summary and Response Document, Vol. 9*, EPA-HQ-RCRA-2009-0640-12132 (Dec. 2014) .............................................................14, 25

EPA, "EPA Takes Final Action to Protect Groundwater from Coal Ash Contamination at Ohio Facility" (Nov. 18, 2022) ...................................................1, 5

EPA, *Final Decision: Denial of Alternative Closure Deadline for General James M. Gavin Plant* (Nov. 18, 2022) ...................................................11, 14, 17, 23

EPA, *Human and Ecological Risk Assessment of Coal Combustion Residuals* (Dec. 2014) ...............................................................................19

EPA, *Proposed Decision: Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant* (Jan. 11, 2022) .............................8, 23

EPA, *Response to Comments on Proposed Gavin Denial* (Nov. 2022) ..................28

## **GLOSSARY**

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **CCR** | Coal combustion residuals |
| **EPA** | U.S. Environmental Protection Agency |
| **RCRA** | Resource Conservation and Recovery Act of 1976, 42 U.S.C. §6901 *et seq*. |
| **USWAG** | Utility Solid Waste Activities Group |
| **WBWT** | Waste below the water table |

## SUMMARY OF THE ARGUMENT

In January 2022, the U.S. Environmental Protection Agency ("EPA") announced for the first time a rule that "surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." Doc. 2017251 at 14-15 ("Opening Br."). EPA did so in a series of interrelated documents issued without following the procedures required by the Administrative Procedure Act ("APA") and the Resource Conservation and Recovery Act ("RCRA"). EPA then implemented that new rule nationwide—instructing States and regulated companies to comply with it. Petitioners in related Case No. 22-1056 challenge EPA's January 2022 action as an unlawful legislative rule. If the Court agrees with Petitioners in that case and vacates the new rule, it should dismiss these consolidated protective-only petitions because the matters within this Court's jurisdiction will have been fully resolved.

In Case No. 22-1056, EPA contends that the new requirements for coal combustion residuals ("CCR") were not final. In November 2022, in the action challenged here, however, EPA "reaffirm[ed]" the rule "that surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." JA644[EPA, "EPA Takes Final Action to Protect Groundwater from Coal Ash Contamination at Ohio Facility" (Nov. 18, 2022) ("Nov. 18, 2022, Press Release")]. And EPA restated the new definitions of "infiltration," "free liquids," and

"impoundment" that implement the new "waste-below-the-water-table" or "WBWT" prohibition—the label used by EPA since January 2022. This time, EPA applied the rule in a final decision denying an extension of the deadline for the Gavin Plant in Ohio to stop sending CCR to a surface impoundment at the plant.

If the Court agrees with EPA that the new "WBWT" prohibition was not final in January 2022, Petitioners here challenge that prohibition as it was reaffirmed in the Final Gavin Denial—which EPA's brief concedes is final agency action. The waste-below-the-water-table prohibition is an unlawful legislative rule because EPA, again, failed to follow statutory procedures for amending its regulations, failed to acknowledge and reconcile the conflict with existing regulations, and failed to consider Petitioners' demonstrated reliance interests in the regulations on the books since 2015.

To avoid judicial review in this case too, EPA claims that its action was simply an "order" that "appli[ed] … an existing rule." Doc. 2027709 at 3 ("EPA Br."). That is true in a way—EPA did apply an existing rule, but it was one that the agency unlawfully first announced in January 2022. And EPA's action was not a run-of-the-mill adjudication of an extension request. EPA received 57 similar requests by November 2020 and, over three years later, has taken final action only on Gavin's request. EPA seized on this particular application as a convenient vehicle for announcing and then "reaffirming" the new closure requirements so that the agency

2

could use them as the legal basis for unrelated actions—including EPA's proposed disapproval of Alabama's CCR permit program.

In substance, the new requirements are statements of general applicability designed to prescribe regulatory obligations. They have the hallmarks of a legislative rule—they conflict with the plain meaning of the codified regulations and EPA's contemporaneous explanations of them; invoke EPA's statutory authority; and are the basis for other EPA actions. EPA is prohibited from adopting new RCRA requirements through case-by-case adjudications because RCRA solid waste criteria must be "promulgate[d] [as] regulations." 42 U.S.C. §6944(a). Had Petitioners been provided the opportunity to comment *before* EPA issued the waste-below-the-water-table ban, they could have demonstrated that EPA's new prohibition is unnecessary to protect groundwater and is contrary to available evidence.

In short, if the Court dismisses the petitions in Case No. 22-1056 on finality grounds, the Court should vacate EPA's waste-below-the-water-table prohibition and related definitions in this case as an unlawful legislative rule. That generally applicable rule—which does not depend on the particular facts of the Gavin Plant— is what is at issue in Case 22-1056 and here, not EPA's denial of Gavin's extension. As to the latter, Gavin has challenged EPA's site-specific allegations of non-compliance and application of the 2022 Rule to the Gavin Plant in the U.S. District Court for the Southern District of Ohio. *See Gavin Power, LLC v. EPA, et al.*, Case

No. 2:24-cv-41 (S.D. Ohio). That district court has exclusive jurisdiction for challenges to EPA's claims about compliance at the Gavin Plant.

## **ARGUMENT**

### I.    **This Court Has Jurisdiction Over the Rule That EPA Reaffirmed in the Final Gavin Denial.**

EPA's brief mischaracterizes these protective petitions as challenges to the deadline for closure of a specific CCR unit. EPA Br. 2. That effort fails because district courts have exclusive jurisdiction over such facility-specific determinations. Instead, Petitioners challenge the waste-below-the-water-table prohibition that EPA announced on January 11, 2022, and that question is properly addressed in Case No. 22-1056, or here if the Court holds that the prohibition was not final in January 2022.

### A.    **The Court Has Jurisdiction to Review the Waste-Below-The-Water-Table Prohibition and Related New Definitions.**

With EPA's issuance of the Final Gavin Denial, there is no dispute that the waste-below-the-water-table prohibition and new definitions are final agency action. EPA now concedes finality, Article III standing, and this Court's jurisdiction over its action (although disputing the nature of its action). *Id.* at 19 n.1, 22.

EPA's generally applicable waste-below-the-water-table prohibition and related definitions are the only "action of the Administrator in promulgating any regulation, or requirement" properly before the Court. 42 U.S.C. §6976(a)(1). Although EPA's brief claims that the Final Gavin Denial was only "an informal adjudication of a regulated entity's request for an extension" (at 27), by EPA's

4

contemporaneous description, the Final Gavin Denial "reaffirm[ed] that surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." JA644[Nov. 18, 2022, Press Release].

EPA's decision to issue what in substance are generally applicable regulations during an informal adjudication—*i.e.*, a process that by definition avoids statutory rulemaking procedures—does not alter this Court's jurisdiction or the nature of Petitioners' challenge. "[A]fter an adjudication has ended, a party is free to argue that the agency exceeded its authority or abused its discretion in adopting new principles through adjudication instead of rulemaking." *See CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 33 (D.C. Cir. 2014). By issuing new regulations under the guise of an informal adjudication, EPA violated both the APA and RCRA, and the Court has jurisdiction to vacate those requirements. Opening Br. 36-39.

## B. The Court Lacks Jurisdiction to Review EPA's Denial of Gavin's Extension Request.

Nor can EPA use this case as a vehicle to expand this Court's RCRA jurisdiction to encompass EPA's site-specific application of its regulations to individual extension requests by facilities across the country. Those questions are properly reviewed in federal district courts. Indeed, EPA does not cite a single case where this Court exercised RCRA jurisdiction over a site-specific application.

EPA claims that its Gavin action, while final, is an "order" that "impose[s] a new closure initiation 'requirement' under RCRA" on the Gavin Plant (at 19) and

nothing more. And EPA incorrectly suggests that Petitioners are challenging EPA's denial of Gavin's extension request. EPA Br. 3-4. But EPA cannot rewrite Petitioners' petitions for review and opening brief simply to expand the Court's original jurisdiction to include facility-specific determinations.

EPA's expansive view of Section 6976(a)(1) conflicts with RCRA's plain language, which vests jurisdiction in this Court only over EPA action "promulgating any regulation, or requirement." 42 U.S.C. §6976(a)(1). This list is exclusive. *See Am. Portland Cement All. v. EPA*, 101 F.3d 772, 773 (D.C. Cir. 1996).

Seeking to end-run this statutory limitation, EPA claims that its denial was an "order" and all "orders" are somehow "requirements" subject to direct review in this Court under RCRA. EPA Br. 21-23 & n.2. But the statute is clear that "requirements" and "orders" are different. *Compare* 42 U.S.C. §6976(a)(1) ("action of the Administrator in promulgating any regulation, or requirement"), *with id.* §6976(a)(2) ("original order" containing "a determination under this chapter required to be made on the record after notice and opportunity for hearing"). EPA concedes (at 23) that its denial of Gavin's extension request is not an "order" within the meaning of 42 U.S.C. §6976(a)(2) because that provision refers *only* to some determinations made by formal adjudication—in contrast to the informal Gavin proceedings. Thus, even if "orders" described in Section 6976(a)(2) may be

reviewable under Section 6976(a)(1), as EPA theorizes, EPA's action on Gavin's request is not one of them.

EPA's argument is contrary to its own regulations governing the extension process (the "Part A" regulations issued in 2020).  The denial of an extension is not a "closure mandate."  EPA Br. 22.  Instead, as EPA previously explained, *the 2015 Rule itself* (specifically, 40 C.F.R. §257.101(a)(1)) contains the relevant generally applicable "requirement … to close."  84 Fed. Reg. 65,941, 65,945 (Dec. 2, 2019). EPA's denial of an extension request, in contrast, merely rejects "an alternative timeframe" to begin closure.  *Id*. at 65,953.

EPA's jurisdictional argument rests on the false premise that "a facility's timely submission of a complete demonstration *lifts* the April 2021 deadline in the 2020 Rule *for good*."  EPA Br. 20 (second emphasis added).  According to EPA (at 21), if it denies an extension, without setting a new deadline, there is "no regulatory closure deadline" and the facility can continue to dispose of CCR indefinitely.  That is illogical and contrary to the plain language of EPA's Part A regulations, which do *not* "remove" the deadline upon the submission of a complete application but merely "*toll* the facility's deadline to cease receipt of waste *until* issuance of a decision[.]" 40 C.F.R. §257.103(f)(3)(ii) (emphases added); *see also* 85 Fed. Reg. 53,516, 53,550-51 (Aug. 28, 2020) (same).

Equating "tolling" with "removing"—the lynchpin of EPA's jurisdictional argument (at 20)—is contrary to the "ordinar[y]" legal usage of that term, which means "suspend." *See Artis v. District of Columbia*, 583 U.S. 71, 80-81 (2018) ("Our decisions employ the terms 'toll' and 'suspend' interchangeably."). And it is contrary to EPA's own contemporaneous explanation that the Part A regulations "*suspend* [] the facility's deadline." 84 Fed. Reg. at 65,958 (emphasis added). Even in its Gavin action, EPA explained that the "April 11, 2021 … regulatory deadline to cease receipt of waste" remained in place *even after* Gavin's submission of a complete application. JA367[EPA, *Proposed Decision: Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant* at 82 (Jan. 11, 2022) ("Proposed Gavin Denial")].

EPA's position has no limiting principle and risks filling this Court's docket with challenges to site-specific assessments for which Congress declined to provide direct review in the Courts of Appeals. The APA's definition of "order" cited by EPA is any action "in a matter *other than* rule making." EPA Br. 23 (emphasis added). Thus, under EPA's view, RCRA grants original jurisdiction to this Court over both "regulations" and everything *other than* a regulation—*i.e.*, everything EPA does under RCRA. That view contorts the meaning of "requirement" beyond any prior recognition—as this Court has held, Section 6976(a)(1) applies where EPA's action "constitute[s] a decision of uniform or widespread application."

*Hazardous Waste Treatment Council v. EPA*, 910 F.2d 974, 976 (D.C. Cir. 1990). Section 6976(a)(1) is a "limitation on [this Court's] jurisdiction," *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)—not a "comprehensive" grant, as EPA claims (at 19).

When Congress intends to vest this Court with original jurisdiction over individualized determinations (including facility-specific "orders"), it says so. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 130-31 (2018) (Congress has "carefully enumerated the seven categories of EPA action for which it wanted immediate circuit-court review and relegated the rest to the jurisdiction of the federal district courts"); *Am. Portland Cement All.*, 101 F.3d at 775 ("Unlike … other environmental statutes … RCRA does not explicitly provide for review of EPA determinations in a Circuit Court of Appeals."); *see also, e.g.*, 42 U.S.C. §7607(b)(1) (providing for review in this Court of "any order under" applicable provisions of the Clean Air Act). Congress chose not to do that here.

## II.    The Final Gavin Denial Reaffirms a Legislative Rule.

As discussed above, EPA's reframing of these protective petitions mischaracterizes the Final Gavin Denial as solely an "order." In substance, the Final Gavin Denial reaffirms the generally applicable waste-below-the-water-table prohibition and related definitions first announced in January 2022, which are a legislative rule subject to RCRA's and the APA's procedural requirements.

**A.    EPA Reaffirmed the 2022 Rule in the Final Gavin Denial.**

The Final Gavin Denial reaffirms a "rule" first announced by EPA in January 2022.  Under the APA, a "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. §551(4).  The waste-below-the-water-table prohibition and the new definitions of "infiltration," "free liquids," and "impoundment" that create that prohibition—all of which are set out in the Final Gavin Denial (Opening Br. 20-23)—easily meet that definition.  EPA's attempt to "label[] its rule an 'adjudication'" does not permit EPA to "escape the requirements" of the APA and RCRA.  *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017); *see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) ("[R]ules is rules, no matter their gloss . . . we have not hesitated to consider an agency pronouncement issued without meeting required APA procedures a rule.") (cleaned up).

EPA claims that the Final Gavin Denial was only a "facility-specific" determination based on "technical findings specific to the Gavin site."  EPA Br. 29.  But the particular facts of the Gavin Plant were irrelevant to the rule that Petitioners challenge.  EPA described a categorical prohibition:  where "at least a portion of the CCR in the [closed unit] remains in contact with groundwater," "[t]hese facts alone" mean that the owner cannot "demonstrate that the closure of the [unit] meets the

performance standards in 40 C.F.R. §257.102(d)."  JA019[EPA, *Final Decision: Denial of Alternative Closure Deadline for General James M. Gavin Plant* at 19 (Nov. 18, 2022) ("Final Gavin Denial")].  Thus, contrary to EPA's claim (at 29), individualized facts such as "the volume of saturated CCR that would remain after closure" of Gavin's unit and whether there was "groundwater flowing through the [Gavin] unit" were immaterial to EPA's decision because mere "contact" was sufficient to violate EPA's waste-below-the-water-table ban.

Further, the agency did not base its action on a "f[i]nd[ing] that [the Fly Ash Reservoir] continually releases leachate and/or CCR to the groundwater," as EPA's brief claims (at 2).  EPA found only that it "potential[ly]" could be.  JA042[Final Gavin Denial at 42].  *Nowhere* in the Final Gavin Denial or EPA's brief does EPA identify *any* data demonstrating groundwater contamination caused by the Gavin CCR units.  None of these facility-specific facts mattered.  The rule that EPA announced was "that surface impoundments or landfills cannot be closed with coal ash in contact with groundwater"—period.  Such a "generalized standard" is a "rule" not an order.  *Safari Club*, 878 F.3d at 332.

Recognizing the general and future effect of its statements, EPA claims the authority to "announc[e] new principles in an adjudicative proceeding."  EPA Br. 30.  Whatever purchase that argument may have in other contexts, the plain language of RCRA precludes it here.  Under RCRA, solid waste "criteria" must be

11

"promulgate[d] [as] regulations." 42 U.S.C. §6944(a). Solid waste "criteria" "define those solid waste management practices which constitute the open dumping of solid waste," *id.* §6907(a)(3), which is precisely EPA's purpose behind the new rule, which EPA all but concedes (at 5). Congress specifically denied EPA discretion to announce these new criteria as "new principles" in an informal adjudication rather than through rulemaking. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (agency may "announc[e] new principles in an adjudicative proceeding" unless, as here, doing so would be "a violation of the Act"); *cf. Nuestar, Inc. v. FCC*, 857 F.3d 886, 892 (D.C. Cir. 2017) (explaining that, unlike here, "the statute's text does not compel that all of the statutory requirements be implemented through rulemaking").

### B. The Waste-Below-The-Water-Table Prohibition Is a Legislative Rule.

The waste-below-the-water-table ban and related definitions of "infiltration," "free liquids," and "impoundment" also bear the hallmarks of a legislative rule. *See Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1009 (D.C. Cir. 1993); *see also Nuestar*, 857 F.3d at 893.

### 1. The New Rule Conflicts With the Plain Meaning of the 2015 Rule.

EPA claims that the new requirements do not substantively change the agency's published regulations as adopted in 2015. EPA Br. 31. But EPA points to

nothing in the 2015 Rule that references—much less bans—closure-in-place with CCR "in contact with" groundwater.  Under the 2015 Rule, closure of a CCR unit may be completed "*either* by leaving the CCR in place and installing a final cover system *or* through removal of the CCR and decontamination of the CCR unit" (what EPA calls "clean closure") and does not place preconditions on either.  40 C.F.R. §257.102(a) (emphases added).  In EPA's words, the 2015 Rule does not "establish restrictions on the situations in which clean closure would be appropriate."  80 Fed. Reg. 21,302, 21,412 (Apr. 17, 2015).  EPA's waste-below-the-water-table prohibition "is irreconcilable with" this plain text and EPA's contemporaneous explanation and is thus a legislative rule.  *Am. Mining Congress*, 995 F.2d at 1009 (internal quotation marks omitted).

Instead of identifying any provision of the 2015 Rule that bans closure-in-place with CCR "in contact with groundwater," EPA suggests that it does not actually hold that position.  EPA's brief claims the agency "has been abundantly clear that clean closure is *not* required and that a unit may close with CCR in place, so long as its closure meets the [performance standards] in Section 257.102(d)."  EPA Br. 38.  But EPA's carefully worded statement does not disclaim the categorical ban against closure-in-place with CCR in contact with groundwater.  Instead, EPA simply assumes, as the categorical rule reaffirmed in the Final Gavin Denial requires, that all "groundwater had been removed from the unit prior to start of [closure-in-

13

place]," JA042[Final Gavin Denial at 42], which is just another way of stating the categorical ban the agency announced in January 2022. Whichever way EPA says it, the new rule effectively *compels* the removal of all CCR from a unit when CCR contacts groundwater—and with it the extreme costs and environmental impacts of excavating, transporting, and disposing of it elsewhere.

EPA's brief (at 37-38) does not substantively address the agency's prior conflicting response to comments in the 2015 Rule. There, EPA stated without qualification that "in cases where the base of an existing or abandoned surface impoundment or landfill is shown to be *below* the natural water table" "[the 2015] [R]ule does not require clean closure of *any* unit." JA637[EPA, *Comment Summary and Response Document, Vol. 9*, EPA-HQ-RCRA-2009-0640-12132, at 197 (Dec. 2014) ("RTC")] (emphases added). EPA does not and cannot reconcile its prior position with the new waste-below-the-water-table prohibition.

EPA claims (at 31-33) that it derived its new definitions of "infiltration," "free liquids," and "impoundment" from "straightforward interpretations" of the 2015 Rule. But the definitions reaffirmed in the Final Gavin Denial *conflict* with and amend the existing regulatory definitions and plain text of the 2015 Rule (Opening Br. 21-23, 42-43), and thus they are a legislative rule. *Am. Mining Congress*, 995 F.2d at 1112.

**Infiltration.**  For its new definition of "infiltration," EPA selects a particular dictionary definition to impose an obligation to address "infiltration" "from any entry and exit point."  EPA Br. 33.  But the text, structure, and purpose of Section 257.102(d)(1)(i) demonstrate that the requirement to "control, minimize or eliminate, to the maximum extent feasible, post-closure infiltration" has a technical meaning that is directed at the "final cover system."  *See* 40 C.F.R. §257.102(b)(1)(iii) ("If closure of the CCR unit will be accomplished by leaving CCR in place," "the final cover system" is how the unit "will achieve the performance standards specified in paragraph (d) of this section.").  EPA confirmed this reading in the preamble to the 2015 Rule.  80 Fed. Reg. at 21,413-14.  EPA's brief points to nothing in the text, context, or purpose of the 2015 Rule that expands the scope of the "infiltration" requirement to the lateral flow of groundwater.

**Free Liquids.**  EPA claims (at 32) that the phrase "free liquids" includes all "groundwater."  But the 2015 Rule already defines "free liquids" and "groundwater" as separate and distinct technical terms, and neither mentions the other.  *See* 40 C.F.R. §257.53.  EPA's argument that "[i]t is beyond reasonable dispute that water, under ambient temperature and pressure, is a liquid" (at 32) is no answer because, while groundwater may be a *liquid*, it is not a "*free* liquid" as that term is defined in the 2015 Rule.  "Groundwater" is separately defined as "water *below* the land surface in a zone of saturation."  40 C.F.R. §257.53 (emphasis added).  Treating all

"groundwater" as "free liquids" ignores that the latter exists only "under ambient temperature and pressure" and effectively eliminates the regulatory distinction between these terms.

**Impoundment.** EPA would also "interpret[]" the term "impoundment" in Section 257.102(d)(1)(ii) using a "general usage [dictionary] definition" (at 36) even though the existing regulations themselves already contain a more precise definition. *See* 40 C.F.R. §257.53 (defining "CCR surface impoundment *or impoundment*" (emphasis added)). The existing definition of "impoundment" in Section 257.53 "appl[ies] to this subpart," which includes Section 257.102(d)(1)(ii). Thus, the term "'[i]mpoundment' in Section 257.102(d)(1)(ii) must take its meaning from" Section 257.53, *not* from "the general usage [dictionary] definition." EPA Br. 36. That existing definition of "impoundment" does not encompass groundwater in a *drained and closed* CCR unit, as EPA's new definition does, but rather refers to a "pond" with visible water that is "*designed* to hold an accumulation of CCR and liquids." *USWAG v. EPA*, 901 F.3d 414, 454 (D.C. Cir. 2018) (Henderson, J., concurring) (emphasis in original) (quoting 40 C.F.R. §257.53) (internal quotation marks omitted). EPA's new definition is so broad that it would even treat *landfills* that intersect groundwater as "impoundments," when the two have different regulatory definitions. *See* 40 C.F.R. §257.53.

Finally, the Court should reject EPA's tepid request for deference regarding these terms, raised only in passing in a footnote. EPA Br. 38 n. 8. EPA has not identified any provision of the 2015 Rule that it contends is "genuinely ambiguous," and, thus, the threshold requirement for deference is absent. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). Indeed, EPA forfeited any claims to deference by asserting that the regulations are unambiguous and failing to seek deference in Case No. 22-1056 or invoke it in the Final Gavin Denial. *See Neustar*, 857 F.3d at 893-94 (discussing forfeiture). In any case, courts do not defer to agency interpretations that "create 'unfair surprise' to regulated parties," as here. *Kisor,* 139 S. Ct. at 2417-28.

### 2.    EPA Explicitly Relied on Its Legislative Authority.

EPA's reliance on RCRA's "statutory safety standard" (at 13) confirms that the agency has adopted a new legislative rule. Contrary to EPA's brief (at 43), in the Final Gavin Denial the agency expressly invoked EPA's legislative rulemaking authority in 42 U.S.C. §6944(a). *See, e.g.*, JA040[Final Gavin Denial at 40] (relying on 42 U.S.C. §6944(a), which provides that "the Administrator shall promulgate regulations containing criteria for determining which facilities shall be classified as sanitary landfills"). Doing so confirms that the Final Gavin Denial was a legislative rule. *Am. Mining Congress*, 995 F.2d at 1112.

EPA's further reliance on this Court's decision in *USWAG*—not as precedent concerning the meaning of closure regulations, which were not at issue in that case,

but as a statement of what the statute supposedly requires—confirms EPA is engaged in legislative rulemaking. EPA argues that "[i]f an unlined impoundment that *could* leak fails RCRA's standard for a sanitary landfill, an unlined impoundment with groundwater flowing into and out of it certainly fails." EPA Br. 37. But in *USWAG*, EPA told the Court the opposite: that "potential—or even actual—leaking of a CCR impoundment will not necessarily result in contamination of groundwater, either above allowable regulatory thresholds, or at all." EPA Br. 85, *USWAG v. EPA*, 901 F.3d 414 (D.C. Cir. 2018) (No. 15-1219). In other words, when it drafted the 2015 Rule, EPA had concluded that the statutory standard did *not* require keeping all CCR entirely out of contact with groundwater. If EPA now believes that some aspect of the *USWAG* decision requires revising the closure provisions (even though *USWAG* did not address those provisions at all), it must revise the 2015 Rule through notice-and-comment rulemaking, as EPA is doing for the provisions of the 2015 Rule that were actually at issue in *USWAG*. *See* 88 Fed. Reg. 31,982 (May 18, 2023) (proposing to regulate "legacy units" following *USWAG*).

In any case, as to closure, the 2015 Rule is more than sufficient to meet RCRA's standard—without EPA's waste-below-the-water-table prohibition and new definitions. As EPA found then, closing an impoundment by draining the standing water and installing a final cover system eliminates the hydraulic head—*i.e.*, the pressure that is exerted by the ponded water in an open surface

18

impoundment.  80 Fed. Reg. at 21,342.  It is this pressure that EPA found "promotes more rapid leaching of contaminants" into groundwater and was the primary risk driver identified by EPA in 2015.  *Id*. at 21,328.  After the impoundment is drained and a final cover is installed, the risks of groundwater contamination "drop dramatically" to be "negligible" as compared to impoundments that are closed by removing the CCR and disposing of it elsewhere.  JA138-39[EPA, *Human and Ecological Risk Assessment of Coal Combustion Residuals* at 5-28 to 5-29 (Dec. 2014)].  And the 2015 Rule requires groundwater monitoring for a minimum of thirty years and corrective action if contaminants are detected above defined levels, to address any remaining risk.  *See* 40 C.F.R. §§257.104(b)(3), 257.104(c), 257.98.

### 3.    EPA Is Using the Requirements in the Final Gavin Denial as Positive Law.

EPA does not dispute that it relied on the Final Gavin Denial in proposing to disapprove Alabama's CCR permit program.  EPA Br. 39-40.  And EPA concedes (at 41) that it did not inform the Alabama Department of Environmental Management of the waste-below-the-water-table prohibition until *after* January 2022, confirming that the 2022 Rule (as reaffirmed in the Final Gavin Denial) was used to fill what EPA perceived to be a legislative gap in the 2015 Rule.

EPA claims (at 40) that the Final Gavin Denial was "simply … an example that illustrated how Section 257.102(d) applies."  But EPA cited the Final Gavin Denial as legal authority for generally applicable requirements and *never once*

mentioned specific details from the Gavin Plant to "illustrate" anything. *See, e.g.*, 88 Fed. Reg. 55,220, 55,237 (Aug. 14, 2023) (citing Final Gavin Denial for the general proposition that "groundwater" is "a 'liquid' under the existing regulation"). Indeed, in the Alabama proposal, EPA itself characterized the Final Gavin Denial as EPA's "*decision* to rely on the plain language meaning of 'infiltration'" over the technical meaning used in the 2015 Rule and throughout EPA's historical implementation of RCRA. *Id*. (emphasis added). And contrary to EPA's brief (at 40), the "operative regulations" alone could not have provided the legal basis for EPA's proposed disapproval because the "express terms" of Alabama's regulations "mirror" the federal regulations. 88 Fed. Reg. at 55,225.

## III.    EPA Cannot Excuse Its Failure to Follow Statutory Requirements for Promulgating New RCRA Rules by Claiming Harmless Error.

EPA concedes that it did not follow the procedures required by RCRA and the APA but claims its failure was harmless error because the agency solicited limited comments on its proposed denial. EPA Br. 46-47. But this Court has made clear that vacatur is required where, as here, EPA "wholly fail[s]" to comply with rulemaking procedures. *NRDC v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020). The Court has "'not been hospitable to government claims of harmless error'" in the face of this "'most egregious'" breach of an agency's duties. *Id.* (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014)).

Thus, when an EPA rule under RCRA is "not issued pursuant to APA rulemaking procedures, there are only two options: 'Either the petition must be dismissed … because the [rule] is not a final regulation'" "'or [the rule] should be vacated' on the merits because it is a final regulation but was promulgated in violation of the APA." *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 226 (D.C. Cir. 2007) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 385 (D.C. Cir. 2002)).

Ignoring these authorities, EPA asserts that Petitioners must overcome the APA's general harmless-error rule, citing *Window Covering Manufacturers Association v. CPSC* ("*WCMA*"), 82 F.4th 1273 (D.C. Cir. 2023). EPA Br. 46-47. But *WCMA* is inapposite. There, everyone agreed the agency was adopting a legislative rule; the challenge instead concerned the agency's failure to include "injury-incident summaries" in its proposal in time for commenters to review them. *WCMA*, 82 F.4th at 1284. In that sort of case, petitioners must show that they would have had something useful to say if the agency had made the missing information available. *Id.* In contrast, where, as here, an agency adopts a legislative rule without acknowledging as much or proposing revisions to the regulations at all, this Court vacates the rule so the agency can follow the mandatory procedures for amending regulations. *Wheeler*, 955 F.3d at 85; *see also Poet Biorefining*, *LLC v. EPA*, 970

F.3d 392, 406 (D.C. Cir. 2020) ("if [a rule] is legislative we must invalidate it at the outset as never having been subjected to notice and comment").

If accepted, EPA's position would permit agencies to ignore the statutory prerequisites for promulgating and amending regulations. Under EPA's view, so long as someone makes some comment on the agency's position, it makes no difference if EPA fails to publish a rule in the Federal Register or amend its existing regulations to reflect a change. Agencies cannot "introduce a proposed rule in this crabwise fashion." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1322-23 (D.C. Cir. 1988) (invalidating EPA rule contained in "notice of six proposed delistings"). EPA's position would make a hash out of the Code of Federal Regulations, allowing agencies to functionally amend and ignore their published rules in individualized adjudications so long as they allow public participation. That obviously is not the law—"[i]t is axiomatic that an agency must adhere to its own regulations[.]" *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986).

Moreover, even assuming prejudice were required here, that low bar would easily be satisfied. To show prejudice, a petitioner need only "show[] that it ha[s] something useful to say" and "is not required to show that its comments would have persuaded the agency to reach a different outcome." *WCMA*, 82 F.4th at 1284-85 (internal citations and quotation marks omitted). Here, EPA never acknowledged

22

that it was changing position nor sought comment on the new rule. *See* JA325-33[Proposed Gavin Denial at 40-48]. Indeed, in addressing the limited comments that were submitted, EPA conceded that "EPA only requested comment on its application of the regulations to Gavin in the Proposed Decision." JA085[Final Gavin Denial at 85]. Petitioners were thus deprived of the opportunity to review proposed regulatory text, offer their own generally applicable data, or propose regulatory alternatives. Because EPA failed to disclose that it was making a pure policy choice, it deprived Petitioners and the public of the opportunity to engage with the agency on those terms.

In addition, the Final Gavin Denial included new rationales absent from the Proposed Gavin Denial—including EPA's new generally applicable finding that "contact with groundwater" causes "the continued formation of leachate in the closed unit [and] the continued releases of that leachate into the surrounding groundwater." JA031,033,038[Final Gavin Denial at 31, 33, 38]. Had Petitioners been provided the opportunity to comment on these issues, they could have submitted data demonstrating that CCR below the water table in a closed unit does *not* automatically result in releases of leachate into the surrounding groundwater because the hydraulic head from the ponded surface water has been eliminated as required by the 2015 Rule. In fact, in EPA's ongoing proceeding to amend the 2015

Rule, commenters have done just that. *See* JA672-73[Comments of the Luminant Companies, EPA-HQ-OLEM-2020-0107-0341, at 24-25 (July 17, 2023)].

## IV.    The Rule Is Arbitrary and Capricious and Unlawful.

EPA makes no attempt to acknowledge or justify its change in position. EPA Br. 47-48. Its refusal to acknowledge "that it is changing position" is a textbook APA violation that requires vacatur. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (internal citation and quotation marks omitted). And it means that EPA failed to consider reliance interests or to explain why the new policy was warranted despite substantial industry investments in existing closure options. *See id.* at 222.

In fact, EPA stood by for years while regulated facilities posted closure plans (certified by Qualified Professional Engineers, *see* Opening Br. 54-55) and began implementing them through substantial investments in physical modifications to plant operations. Contrary to EPA's claim (at 11), Gavin's application—and the 56 other applications—were not EPA's "first opportunity to evaluate the adequacy of closure plans." Under the 2015 Rule, closure plans were required to be certified by October 2016, 40 C.F.R. §257.102(b)(2), and, just two months later, EPA claims that Congress gave it the authority in the WIIN Act to enforce violations of the closure requirements, EPA Br. 5-6. EPA's "conspicuous inaction" over the next five years—during which EPA claims to have possessed direct enforcement and

oversight authority—gave regulated parties no reason to foresee EPA's January 2022 pronouncements, let alone revise their closure plans. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012). It is unlawful "to ignore such matters." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

That is true whether the Final Gavin Denial is a "rule" setting out new requirements or whether it was an "order." EPA Br. 28-30. "New rules set through adjudication must meet the same standard of reasonableness as notice and comment rulemaking." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 476 (D.C. Cir. 2020).

As for fair notice, EPA says that Petitioners do not cite a prior instance in which EPA endorsed Petitioners' reading of the regulations. EPA Br. 49. But from the very beginning, EPA did just that by expressly stating in response to comments on the 2015 Rule that the "rule does not require clean closure of any unit" even "in cases where the base of an existing or abandoned surface impoundment or landfill is shown to be below the natural water table." JA637[RTC at 197]. Seven years later, facilities that complied with EPA's contemporaneous explanation of the 2015 Rule were suddenly and, in some cases, retroactively declared out of compliance by EPA's declaration in January 2022 that no CCR unit with CCR in contact with groundwater may use the closure-in-place option.

**V.     This Court Lacks Jurisdiction to Review Gavin-Specific Findings But if the Court Disagrees It Should Hold That They Are Unlawful.**

As explained, this Court does not have jurisdiction over EPA's application of existing requirements to Gavin—that matter is presently pending in the U.S. District Court for the Southern District of Ohio.  *See supra* at 3-9; Opening Br. 52-53.  But even if it did, EPA's determinations are unlawful.[1]

*First,* EPA's retroactive application of its unlawful 2022 Rule to Gavin's previously-closed Fly Ash Reservoir is arbitrary and capricious.  In addition to ignoring Gavin's reliance interests and depriving Gavin of fair notice, Opening Br. 48-50, EPA asks this Court to ignore the extensive post-closure groundwater monitoring and corrective action requirements in the 2015 Rule, claiming (at 16) that its newly-announced requirements are necessary to prevent "abandon[ment of] millions of tons of coal ash in groundwater as a perpetual source of contamination for drinking water supplies."  There is no such gap in the existing regulatory regime.  Rather, for units that are closed-in-place, like the Fly Ash Reservoir, the 2015 Rule requires an extensive monitoring network for a minimum of thirty years and corrective action if there are certain levels of contaminants in groundwater.  *See* 40 C.F.R. §§257.104(b)(3), 257.104(c), 257.98.

---

[1] Section V is offered only by Petitioner Gavin.

*Second*, as EPA concedes (at 55), Petitioners do not challenge EPA's authority to enforce its CCR regulations in this case. An EPA enforcement action must be pursued in district court, 42 U.S.C. §6928(a)(1), and an EPA enforcement order under RCRA is similarly challenged in a district court, 5 U.S.C. §703. This underscores EPA's improper end-run around the RCRA judicial review provisions.[2]

Importantly, Gavin made the necessary demonstration under the Part A regulations, by demonstrating that, among other things, the facility "is in compliance with all of the requirements of this subpart." 40 C.F.R. §§257.103(f)(1)(iii), (f)(2)(iii). The regulations require a Qualified Professional Engineer to certify compliance and do not require EPA's approval. *Id*. §257.102(b)(4). When EPA promulgated the 2015 Rule, it specified that its goal was to "ensure that the [closure performance standards] are sufficiently objective and technically precise that a qualified professional engineer will be able to certify that they have been met." 80 Fed. Reg. at 21,337. With its certifications, Gavin was and is in compliance. Closure plans documenting the steps to complete closure were prepared and followed in accordance with 40 C.F.R. §257.102(b). Gavin installed and operates its groundwater monitoring network, *id*. §257.91(a)(2), has implemented sampling and

---

[2] To the extent EPA seeks a preemptive declaration regarding waiver of any challenges to "EPA's findings," that issue is not before this Court and is for a subsequent court to decide.

analysis procedures, *id.* §257.93, and has completed written alternate source demonstrations, *id.* §257.94(e)(2). A Qualified Professional Engineer issued certifications confirming compliance with each of those requirements. *See e.g., id*. §§257.91(f), 257.93(f)(6), 257.94(e)(2), 257.102(b)(4), 257.102(d)(3)(iii), 257.102(f)(3). All required information was placed in an operating record, all required notifications were provided to the State Director, and all required material was posted to a CCR compliance website. *See id*. §§257.105, 106, 107. EPA does not argue otherwise. *See* JA615[EPA, *Response to Comments on Proposed Gavin Denial* at 172 (Nov. 2022)].

EPA now claims that Gavin may not rely on certifications to demonstrate compliance. EPA Br. 53-55. But the current regulations make clear that EPA does not stand in the shoes of a Qualified Professional Engineer, *see* 40 C.F.R. §257.102(b)(4)—that would require that EPA be "the permitting authority" under a federal CCR permitting program, *id*., which EPA has failed to adopt. 85 Fed. Reg. at 53,519; 83 Fed. Reg. 36,435, 36,439 (July 30, 2018). EPA lacks authority to do indirectly now what it may intend to do in a future permitting program.

## CONCLUSION

The Court should vacate the waste-below-the-water-table prohibition and related new definitions.

28

Dated: January 31, 2024                    Respectfully submitted,


                                           s/ P. Stephen Gidiere III
Helgi C. Walker                            P. Stephen Gidiere III
David Fotouhi                              Julia B. Barber
Matt Gregory                               BALCH & BINGHAM LLP
GIBSON, DUNN & CRUTCHER LLP                1901 6th Ave. N., Ste. 1500
1050 Connecticut Ave., N.W.                Birmingham, Alabama 35203
Washington, D.C. 20036                     205-251-8100
                                           sgidiere@balch.com
Michael L. Raiff
GIBSON, DUNN & CRUTCHER LLP                Stephanie Zapata Moore
2001 Ross Ave., Ste. 2100                  Executive Vice President & General
Dallas, Texas 75201                        Counsel
                                           Daniel J. Kelly
                                           Senior Vice President & Deputy General
                                           Counsel
                                           David W. Mitchell
                                           Senior Counsel, Environmental
                                           VISTRA CORP.
                                           6555 Sierra Drive
                                           Irving, Texas 75039

                                           *Counsel for Petitioners Electric Energy,
                                           Inc., Luminant Generation Company
                                           LLC, Coleto Creek Power, LLC, Miami
                                           Fort Power Company LLC, Zimmer
                                           Power Company LLC, Dynegy Midwest
                                           Generation, LLC, Illinois Power
                                           Generating Company, Illinois Power
                                           Resources Generating, LLC, and
                                           Kincaid Generation, L.L.C.*

s/ Douglas Green
Douglas Green
Margaret K. Fawal
VENABLE LLP
600 Massachusetts Ave, NW
Washington, DC 20001
(202) 344-4483
dhgreen@venable.com
mkfawal@venable.com

*Counsel for Petitioner Utility Solid Waste Activities Group*

s/ Stacey L. VanBelleghem
Stacey L. VanBelleghem
Karl A. Karg
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
stacey.vanbelleghem@lw.com
karl.karg@lw.com

*Counsel for Petitioner Gavin Power, LLC*

s/ Ann H. MacDonald
Joshua R. More
Ann H. MacDonald
ARENTFOX SCHIFF LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: (312) 258-5500
Fax: (312) 258-5600
joshua.more@afslaw.com
ann.macdonald@afslaw.com

*Counsel for Petitioners Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Public Service Company of Oklahoma, Southwestern Electric Power Company, and Wheeling Power Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel states that this document complies the Court's Order of August 8, 2023, because it contains 6,471 words, as counted by Microsoft Word, excluding the parts excluded by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). This document also complies with typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: January 31, 2024

s/ P. Stephen Gidiere III
P. Stephen Gidiere III

## **CERTIFICATE OF SERVICE**

I certify that on this 31st day of January, 2024, a copy of the foregoing document was served electronically through the Court's CM/ECF system on all registered counsel.


Dated: January 31, 2024


                                        s/ P. Stephen Gidiere III
                                        P. Stephen Gidiere III